[No. B111565. Second Dist., Div. One. Aug. 19, 1997.]

GARY RAMONA, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
HOLLY RAMONA, Real Party in Interest.

## COUNSEL

Ephraim Margolin, Chandler, Wood, Harrington & Maffly, Richard Harrington and Robert Timothy Reagan for Petitioner.

No appearance for Respondent.

Allred, Maroko & Goldberg and Lisa Bloom for Real Party in Interest.

## OPINION

**ORTEGA, J.**—Plaintiff Holly Ramona filed a childhood sexual abuse lawsuit against her father, Gary Ramona, alleging she had completely repressed the abuse from her conscious memory until after she underwent psychotherapy as an adult. Apart from what Holly would testify to at trial, there is no other substantial evidence to support her claims of abuse. Gary sought summary judgment, contending Holly should be barred from testifying because her memory regarding the alleged incidents was tainted by the therapeutic administration of sodium amytal. Although Holly presently believes she was molested, the record is undisputed she was uncertain in her belief before being interviewed while under the influence of sodium amytal and assured by her therapist she had not lied during the interview.

Relying upon the *Kelly*[1] test, Gary argued the lack of general acceptance in the scientific community of the reliability of repressed memories recalled only after commencing psychotherapy and undergoing a sodium amytal interview should bar Holly's testimony. The trial court denied summary judgment, finding the *Kelly* test inapplicable to sodium amytal cases, which it distinguished from hypnosis cases. Gary petitioned for extraordinary writ review, claiming Holly's testimony should be excluded, as a matter of law, under *Kelly*. We issued an order to show cause. For the reasons that follow, we conclude Holly's testimony must be excluded and grant the petition.

### FACTS[2]

Holly was born on August 16, 1970. In September 1988, she left her parents' home in St. Helena, California, to attend the University of California at Irvine. In the summer of 1989, she returned home to St. Helena and obtained a summer job at the winery where Gary was employed. That summer, Holly's mother, Stephanie Ramona, discovered Holly vomiting in the bathroom. Holly admitted to Stephanie that she thought she had an eating disorder. Gary arranged for Holly to see psychiatrist Barry Grundland in Napa County that summer, and Stephanie arranged for Holly to see marriage, family, and child counselor Marche Isabella in Irvine that fall.

Stephanie discussed Holly's condition with Isabella before Holly went to see her. After Isabella told Stephanie that up to 80 percent of persons with

---

[1]*People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]. Under *Kelly*, the "new scientific technique must be ' "sufficiently established to have gained general acceptance in the particular field to which it belongs.' " (17 Cal.3d at p. 30, italics removed.)" (*People* v. *Leahy* (1994) 8 Cal.4th 587, 611 [34 Cal.Rptr.2d 663, 882 P.2d 321].)

[2]Apart from what Holly would testify to at trial, the record on the summary judgment motion was largely undisputed.

eating disorders have been sexually abused, Stephanie asked Holly whether Gary had sexually abused her. At that time, Holly did not claim to have been abused.

Holly began treatment for bulimia and depression with Isabella in September 1989. At their first meeting, Isabella asked Holly, among other things, if she had been sexually abused. Isabella told Holly that 60 to 80 percent of Isabella's patients with eating disorders had experienced abuse of some kind, including sexual abuse. At the first session, Holly did not claim to have been abused. Several weeks later, Holly began group therapy with Isabella's female patients with eating disorders, some of whom had been sexually abused.

In late December 1990, Holly went home during a school break and received "a look from [Gary] that was disturbing[.]" Until the beginning of January 1990, Holly had no memory of being sexually abused by Gary, and had not mentioned any such claims to Stephanie or Isabella. In January 1990, while driving back to school with Stephanie, Holly began experiencing visual images involving Gary which have been referred to in the record as " 'flashbacks' " or " 'visual flashes.' "[3] These flashbacks related to a period when Holly was between five and eight years of age. When the flashbacks began, Holly was uncertain whether they were true memories of sexual abuse.

[3]Excerpts from Holly's deposition testimony (filed in support of and opposition to Gary's summary judgment motion below) contained scattered references to the flashbacks which Holly perceived in early 1990, prior to the sodium amytal treatment. The record is not clear as to what she "saw" in each flashback, but we have been able to glean the following. In one instance, she saw her father sitting next to her in bed, rubbing her upper thigh with his hand. (The fact that Holly also claimed to have "seen" her own face and head during this and other flashbacks differentiates these flashbacks from ordinary memories.) In another incident, Holly saw herself lying down with a scared look on her face, pushing away her father's head from between her legs. (She testified she did not know if he was orally copulating her or whether she was wearing a nightgown.) In another incident, Holly recalled her father's hand over her mouth while she walked to the bathroom.

In excerpts from a transcribed psychiatric examination conducted on November 21, 1991, in the presence of counsel for both parties (filed in support of the summary judgment motion below), Holly related having had flashbacks between January and March 1990, prior to the sodium amytal interview, of her father lying on top of her and rubbing the inside of her thigh. In the psychiatric examination, Holly described the difference between her memories of other events and her flashbacks as follows: "I can see the flashback when I choose to as it was when I first saw it, so it's something that stays with me but it is not—The only difference I can make from a memory is that when I remember is that it was longer ago than something that happened yesterday, and I don't always see as much movement as I would with a memory of me going to the store yesterday and what I thought and what I did. It is more like a freeze frame of something I remember." Holly further explained that with a flashback, she does not remember the events preceding or following the "freeze frame."

In February 1990, a woman Holly had met in group therapy told Holly that she had undergone a sodium amytal interview for the purpose of uncovering memories of sexual abuse. The woman told Holly that the sodium amytal interview confirmed she had been sexually abused.

To determine whether her flashbacks were true memories of sexual abuse, Holly asked to undergo a sodium amytal interview, after being assured by Isabella that only persons trained to lie under the drug's influence could do so. Holly, who was hospitalized at Western Medical Center in March 1990, told one or more hospital staff members that she was there partly to undergo a sodium amytal interview which perhaps would uncover memories of sexual abuse. Sodium amytal is not a treatment for depression or bulimia, the conditions for which Holly had sought treatment.

On March 14, 1990, psychiatrist Richard Rose and Isabella conducted a sodium amytal interview of Holly at Western Medical Center. No audio or video recording or written transcript was made of Holly's descriptions of her flashbacks before the sodium amytal interview, and no recording or transcript was made of the interview itself.[4]

According to Holly's prior trial testimony,[5] the sole allegedly new incident Holly had recalled during the sodium amytal interview was that Holly's

---

[4]On Holly's patient chart at Western Medical Center, Isabella wrote some notes regarding the sodium amytal interview, which Gary submitted in support of his summary judgment motion below. According to Isabella's notes, during the sodium amytal interview, Holly described an incident around age seven when Gary, who was naked, got on top of her; an incident when Gary vaginally raped her; and an incident involving a struggle in which Holly was fearful that Gary would rape her again.

[5]This is not the first lawsuit relating to Gary's alleged molestation of Holly. There was a Napa County action in which Gary had sued Stephanie (who was dismissed), Isabella, Rose, and the Western Medical Center, for causing Holly to falsely believe she had been molested as a child. The jury awarded Gary a $500,000 judgment which is now final. (Ramona v. Ramona (Super. Ct. Napa County, No. 61898).)

After Gary won the Napa County action, he moved for summary judgment in this action, claiming Holly's complaint was barred by the doctrine of collateral estoppel. That motion was granted and Holly appealed from the summary judgment. We reversed, finding the Napa County judgment for Gary against Holly's former therapists did not preclude Holly from suing Gary for sexual molestation because, as a matter of law, there was no privity between Holly and her former therapists. (Ramona v. Ramona (Oct. 3, 1995) B091052 [nonpub. opn.].)

We further note this is Holly's second action against Gary. Holly had previously filed an assault and battery action against Gary, which she voluntarily transferred to Napa County (Ramona v. Ramona (Super. Ct. Napa County, No. 62124)), where Gary's action was then pending. On the eve of the Napa County trial, however, Holly voluntarily dismissed her prior complaint without prejudice, after the court refused to allow her to amend her complaint to allege she had recalled some incidents of abuse before the sodium amytal interview. The trial court had refused to allow the amendment, stating it would have been prejudicial to do so only days before trial. After Holly dismissed her complaint, Gary moved to enter judgment on Holly's complaint with prejudice, contending the denial of the motion to amend constituted a

maternal grandmother had been raped by the grandmother's brothers. Holly concedes she does not know whether this is true or not (Stephanie testified she did not know whether Holly's grandmother had been raped), but points out that in any event, she is not seeking damages "for any incidents which she remembered only during the amytal interview." (Italics omitted.)

Following the sodium amytal interview, Holly was told what she had said during the interview. Holly then told Isabella, Rose, Stephanie, and a nurse she was not entirely convinced that what she had said during the interview was the truth. These people assured Holly she had not lied during the interview (even though no one knew whether Holly's grandmother had been raped), and Holly became convinced that Gary had sexually molested her as a child. Holly then confronted Gary with her allegation that he had sexually abused her. Gary and Stephanie were divorced, and Gary lost his job with the winery.

In 1992, two years after the sodium amytal interview, Holly had additional flashbacks of alleged sexual abuse committed by Gary when she was twelve through sixteen years old (the earlier flashbacks were from ages five through eight). The 1992 flashbacks were of an incident of forced vaginal intercourse when Holly was between 14 and 16, an incident of oral sex when Holly was 12 or 13, an incident of kissing when Holly was between 12 and 14, and an incident of anal sex when Holly was 12 or 13.

Holly filed this lawsuit against Gary on May 4, 1992, when she was 21. Holly filed her complaint before her 26th birthday and, due to the 1990 amendments to Code of Civil Procedure section 340.1, had no need to claim she had repressed all memory of abuse to avail herself of the delayed discovery rule.[6] Nevertheless, Holly alleged she had only recently "discovered" or recalled the abuse in January 1990, about three months after beginning treatment for depression and bulimia.

fatal judicial admission that Holly could not recall any abuse before the sodium amytal treatment. When Gary's motion was denied, he appealed from the order denying his motion to enter judgment. The First District dismissed Gary's appeal as nonappealable, but also addressed the merits in its opinion. (*Ramona* v. *Ramona* (Apr. 14, 1993) A057964 [nonpub. opn.].) The First District stated Gary had erroneously assumed Holly's complaint admitted she had had no recollection of the alleged molestation before the sodium amytal interview. Liberally construed, the First District stated, Holly's complaint did not preclude the possibility of earlier recollections.

[6]Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

Prior to 1986 when section 340.1, a specific statute of limitations for childhood sexual abuse actions, was enacted, the general one-year tort statute of limitations applied to such complaints. The one-year statute commenced running upon the plaintiff's eighteenth birthday. Absent tolling under the common law delayed discovery rule, the one-year statute would expire upon the plaintiff's nineteenth birthday.

The 1986 enactment of section 340.1 gave the victim of certain types of molestation committed by household or family members three years after majority or until age twenty-one

Gary moved for summary judgment, contending Holly was precluded under *Kelly* from testifying about her recovered repressed memories of sexual abuse, and there was no other substantial evidence that the abuse had occurred. Gary asserted that not only had Isabella implanted false memories of sexual abuse into Holly's mind through unduly suggestive questioning,

---

to file a complaint. In 1987, the Sixth Appellate District commented upon the new statute's effect in *DeRose* v. *Carswell* (1987) 196 Cal.App.3d 1011 [242 Cal.Rptr. 368]. The plaintiff in *DeRose* had filed her sexual abuse complaint over five years after her eighteenth birthday, too late even under the new three-year statute. As for the delayed discovery rule, the *DeRose* court rejected its application, stating: "If DeRose could and did allege that she repressed her memories of the sexual assaults until one year before filing her complaint, she might be able to invoke the delayed discovery rule. While the assaults that DeRose has alleged caused serious harm as a matter of law, DeRose could not logically be charged with awareness of the harm if she had not been aware of the assaults. In fact, there are allegations in the complaint that might be read to suggest that this was the case. DeRose, however, both in the superior court and on appeal, disclaimed that interpretation of the complaint. . . ." (*Id.* at p. 1018, fn. omitted.)

In 1988, the Third Appellate District similarly rejected a delayed discovery claim of a plaintiff who alleged his former Boy Scout leader had sexually molested him. (*Snyder* v. *Boy Scouts of America, Inc.* (1988) 205 Cal.App.3d 1318 [253 Cal.Rptr. 156].) The *Snyder* court refused to apply the longer three-year limitations period available against resident molesters under section 340.1 to the acts allegedly committed by the scout leader. "In enacting a special statute of limitations for some sexual molestations the Legislature made a policy decision over the scope of the special statute. It deliberately chose to limit the scope of the statute to cases where the offending defendant was a 'household or family member.' The courts are not at liberty to rethink that policy decision or rewrite the statute to extend its application to persons excluded by the Legislature." (205 Cal.App.3d at p. 1325.)

In January 1990, the First Appellate District in *Evans* v. *Eckelman* (1990) 216 Cal.App.3d 1609 [265 Cal.Rptr. 605], granted leave to amend a complaint to allege facts to invoke the delayed discovery rule. Such facts would include, the court noted, either a total repression of the alleged acts of sexual abuse, or an unawareness, continuing into adulthood, that the acts were wrongful. The *Evans* court rejected, however, the notion that the plaintiffs' delayed discovery of the causal connection between the sexual abuse and their psychological injuries would toll the statute of limitations, stating: "We conclude that, where the plaintiff does not allege ignorance or suppression of the sexual abuse itself, his lack of awareness of the full extent of injury from such abuse does not delay accrual of the cause of action." (*Id.* at p. 1620.)

In 1990, the Legislature amended section 340.1 to extend the limitations period to either eight years after majority or three years after the date when the plaintiff discovers or reasonably should have discovered that the psychological injury or illness was caused by the childhood sexual abuse, whichever period expires later. (§ 340.1, subd. (a).) It also made section 340.1 applicable to child sexual molestation proscribed by certain Penal Code sections, without regard to whether the perpetrator was a household or family member. Under the 1990 amendment, the complaint in *DeRose* would have been timely because it was filed before the plaintiff's 26th birthday, the longer limitations period would have been applicable to the alleged molestation committed by a nonfamily member in *Snyder*, and the plaintiff in *Evans* would have had three years to sue following the discovery of the causal relation between the abuse and the psychological injury. After the 1990 amendment, the expanded limitations period applies to the child sexual abuse plaintiff without regard to whether there was total repression of all memory of the abuse. (*Sellery* v. *Cressey* (1996) 48 Cal.App.4th 538 [55 Cal.Rptr.2d 706].)

but also Isabella and Rose had conducted a sodium amytal interview after incorrectly telling Holly that she could not lie under the drug's influence unless trained to do so. In addition, Gary asserted, Holly had been improperly assured after the interview that she had not lied and that she had been sexually abused. Only then, Gary pointed out, did Holly come to be convinced that her flashbacks were true and that he had molested her.

The parties filed opposing expert witness declarations concerning the acceptance or lack thereof in the scientific community of the reliability of repressed memories recalled after commencing therapy and undergoing a sodium amytal interview.

The trial court denied the motion, finding the *Kelly* test "is inapplicable to psychological testimony" under *People* v. *Cegers* (1992) 7 Cal.App.4th 988 [9 Cal.Rptr.2d 297]. Apparently viewing the conflicting expert declarations as creating issues of admissibility and credibility for the fact finder (rather than permitting the court to exclude Holly's testimony under *Kelly*), the trial court stated that there were "triable issues as to the admissibility and credibility of plaintiff's testimony. Those disputed facts are [quoting items 43, 44, and 45 from the parties' statement of disputed and undisputed facts]:

"43. 'There is no scientific consensus that a person can experience a repeated trauma occurring over the course of many years, have no memory of the trauma during and after those years, and then "recover" memory of the trauma later.' Defendant's evidence that the fact is undisputed: 1st Loftus Decl ¶¶ 27-31, 34; 1st Hudson Decl ¶¶ 5-9, 16-18; 1st Ofshe Decl ¶¶ 16, 31. Plaintiff's evidence that the fact is disputed: Brown Decl; Conte Decl; Ross Decl; Summit Decl.

"44. 'There is an overwhelming scientific consensus that a memory of an event, where the memory is claimed to have been recovered after many years, cannot be judged accurate unless the occurrence of the event is corroborated and proved by independent evidence.' Defendant's evidence that the fact is undisputed: 1st Loftus Decl ¶¶ 14-26, 34; 1st Hudson Decl ¶¶ 12-15. Plaintiff's evidence that the fact is disputed: Brown Decl; Conte Decl; Ross Decl; Summit Decl.

"45. 'Nothing Holly Ramona claims to remember about alleged events of sexual abuse by Gary Ramona against Holly Ramona can be corroborated and proved by admissible evidence.' Defendant's evidence that the fact is undisputed: No evidence of corroboration. Plaintiff's evidence that the fact is disputed: Holly Ramona Depo, Bloom Decl Exh A."

With regard to the hypnosis cases cited by Gary in support of his position that Holly's testimony was rendered inadmissible by virtue of her injection

with sodium amytal, the court stated: "Cases cited by defendant that limit the use of hypnotically induced testimony are not controlling as to a witness's testimony concerning matters discussed during a sodium Amytal interview, because: (1) this action presents a different mode of recollection, (2) the sodium Amytal interview had a different purpose—treatment vs recall—and (3) there is a remoteness in time between the sodium Amytal interview and the witness's testimony."

## STANDARD OF REVIEW

■ Summary judgment is appropriate only where no material issue of fact exists or where the record establishes as a matter of law that a cause of action asserted against a party cannot prevail. After examining the facts before the trial judge on a summary judgment motion, an appellate court independently determines their effect as a matter of law. (*Nicholson* v. *Lucas* (1994) 21 Cal.App.4th 1657, 1664 [26 Cal.Rptr.2d 778].)

According to section 437c, subdivision (o)(2), "A defendant or cross-defendant has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Once the defendant or cross-defendant has met that burden, the burden shifts to the plaintiff or cross-complainant to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff or cross-complainant may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto."

## DISCUSSION

■ We must decide whether Holly, who claims to have repressed all memory of childhood sexual abuse until after commencing therapy in September 1989, and had questioned the truth of her recollections until after being told the results of her sodium amytal interview in March 1990, should be prohibited under *Kelly* from testifying that Gary had sexually abused her between ages five and eight. In part I we conclude Holly's testimony regarding the alleged abuse between ages five and eight is inadmissible under *Kelly*. It is well established in California that a witness whose memory was refreshed by sodium amytal may not testify to the truth of that memory. Holly has failed to refute Gary's expert evidence that her memory regarding the incidents discussed during the sodium amytal interview was tainted,

thereby rendering · effective cross-examination impossible. She has also failed to establish the existence of a triable issue regarding her personal knowledge, before the sodium amytal interview, that she had been abused.

In part II we address the admissibility of Holly's testimony regarding the alleged incidents of abuse between ages 12 and 16, which were first recalled in 1992. Although those incidents were not recalled or discussed during the 1990 sodium amytal interview, we likewise conclude Holly's testimony on those matters is inadmissible under *Kelly*. The record fails to show a consensus that Holly could accurately recall repressed memories of sexual abuse two years after undergoing the sodium amytal interview.

## I

Sodium amytal interviews have long been held to be unreliable in California under the *Frye*[7] test, later called the *Kelly-Frye* test, and more recently referred to as the *Kelly* test. (*People* v. *Leahy, supra,* 8 Cal.4th at p. 612.)[8] In *People* v. *Jones* (1959) 52 Cal.2d 636, 653 [343 P.2d 577], the California Supreme Court stated: "[T]he result of . . . a [sodium pentothal] test is not admissible in a criminal case. The courts have consistently held that whether the test is a polygraph test, or a *sodium amytal* or sodium pentothal test, the results are not such as to be admissible for or against the defendant because of a lack of scientific certainty about the results. [Citations.]" (Italics added.)[9] Although *Jones* did not cite *Frye* by name,[10] the California Supreme Court later explained in *Huntingdon* v. *Crowley* (1966) 64 Cal.2d 647,

---

[7]*Frye* v. *United States* (D.C. Cir. 1923) 293 Fed. 1013, 1014 [54 App.D.C. 46, 34 A.L.R. 145].

[8]In *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 [113 S.Ct. 2786, 125 L.Ed.2d 469], the United States Supreme Court rejected the *Frye* test due to the enactment of the Federal Rules of Evidence. Nonetheless, our Supreme Court has reaffirmed that *Kelly*, which adopted the *Frye* test for use in this state, remains the rule in California. (*People* v. *Leahy, supra,* 8 Cal.4th at p. 612.)

[9]Although sodium amytal, like sodium pentothal, has been called a " 'truth serum' " (*People* v. *Theriot* (1967) 252 Cal.App.2d 222, 249, fn. 8 [60 Cal.Rptr. 279]), it has also been called "a hypnotic sedative [that] puts people to sleep" (*In re Cameron* (1968) 68 Cal.2d 487, 495, fn. 4 [67 Cal.Rptr. 529, 439 P.2d 633]), and a drug "which is not a 'truth serum' at all but which causes hallucinations in the patient for four or five hours" (*Gill* v. *Epstein* (1965) 62 Cal.2d 611, 613 [44 Cal.Rptr. 45, 401 P.2d 397]). In another case, the expert noted that sodium amytal "enhances a subject's willingness to talk [without] affecting the truthfulness of what he says[]." (*People* v. *Stanley* (1995) 10 Cal.4th 764, 785 [42 Cal.Rptr.2d 543, 897 P.2d 481].)

[10]*Jones* did cite a federal statutory rape and sodomy case, *Lindsey* v. *United States* (9th Cir. 1956) 237 F.2d 893, which cited *Frye*. In *Lindsey*, the victim, the defendant's 15-year-old adopted daughter, was given a "sodium-pentothal ('truth serum') test[.]" (*Id.* at p. 894.) The sodium-pentothal test results were admitted to rehabilitate the victim's testimony after she was impeached on cross-examination with her retraction of her allegations against the

653-654 [51 Cal.Rptr. 254, 414 P.2d 382], that it had applied the *Frye* test in *Jones,* stating: " 'Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made *must be sufficiently established to have gained general acceptance in the particular field in which it belongs.'* (Italics added.) [Quoting *Frye* v. *United States, supra,* 293 Fed. at p. 1014.] This is also the rule in California. (See, e.g., *People* v. *Jones*[, *supra,*] 52 Cal.2d [at p.] 653 . . . ['truth serum']; *People* v. *Carter* (1957) 48 Cal.2d 737, 752 . . . ['lie detector' test] . . . .)" *(Huntingdon* v. *Crowley, supra,* 64 Cal.2d at pp. 653-654.)

Fourteen years after *Jones* was decided, an appellate court rejected the reliability of sodium amytal interviews in *People* v. *Johnson* (1973) 32 Cal.App.3d 988 [109 Cal.Rptr. 118], where a videotape of the defendant's sodium amytal interview had been admitted over his objection. At trial, defense experts testified that "sodium amytal is not a universal truth drug, and that it is quite possible for a person to lie under the influence of sodium amytal. They further stated a subject's truthfulness under the influence

---

defendant. Also admitted into evidence was the administering psychiatrist's testimony that the drug was highly reliable in removing an individual's inhibitions against suppressing information. The Ninth Circuit concluded the sodium pentothal test results were not "entitled to judicial recognition, through having gained 'general acceptance in the particular field in which it belongs' [citing *Frye* v. *United States, supra,* 293 Fed. at p. 1014], as a trustworthy truth-extracting procedure, which is reliably so in all cases." *(Lindsey* v. *United States, supra,* 237 F.2d at p. 896.) The defendant's conviction was reversed due to the erroneous admission of the sodium pentothal interview.

In explaining its decision, the Ninth Circuit stated: "Although narcoanalysis in general, and the sodium-pentothal interview in particular, may be a useful tool in the psychiatric examination of an individual, the courts have not generally recognized the trustworthiness and reliability of such tests as being sufficiently well established to accord the results the status of competent evidence. [Citations.]" *(Lindsey* v. *United States, supra,* 237 F.2d at pp. 895-896.) "The expected effect of the drug is to dispel inhibitions so the subject will talk freely, but it seems scientific tests reveal that people thus prompted to speak freely do not always tell the truth. [Citations.]" *(Id.* at p. 896.) Quoting from two law review articles, the court further noted: " '. . . [E]xperimental and clinical findings indicate that only individuals who have conscious and unconscious reasons for doing so are inclined to confess and yield to interrogation under drug influence. On the other hand, some are able to withhold information and some, especially character neurotics, are able to lie. Others are so suggestible they will describe, in response to suggestive questioning, behavior which in fact never occurred. But drugs are not 'truth sera'. They lessen inhibitions to verbalization and stimulate unrepressed expression not only of fact but of fancy and suggestion as well. Thus the material produced is not "truth" in the sense that it conforms to empirical fact.' [Citation.] [¶] . . . [¶] 'The intravenous injection of a drug by a physician in a hospital may appear more scientific than the drinking of large amounts of bourbon in a tavern, but the end result displayed in the subject's speech may be no more reliable.' [Citation.]" *(Ibid.)*

of sodium amytal is an 'all or nothing' thing and that *any* evidence of untruthfulness would make the entire sodium amytal interview unreliable." (*Id.* at p. 1001.) Based on the unequivocal evidence that the defendant had lied during the sodium amytal interview about being in his neighbor's home on the night in question, the defense experts both "stated that the entire contents of the sodium amytal interview would be untrustworthy. Each doctor emphasized the extreme suggestibility of a person under the influence of sodium amytal, and Dr. Wilson even suggested that [the defendant's] knowledge of the impending charge would lead possibly to his giving a false confession." (*Ibid.*) Citing the prosecution's failure to attempt to prove the reliability of sodium amytal tests and the defendant's unopposed expert testimony refuting the drug's reliability, the appellate court concluded it was reversible error to have admitted the evidence.

Both *Jones* and *Johnson* have been repeatedly cited for the proposition that the *Kelly* test applies to new scientific techniques such as the use of sodium pentothal or sodium amytal. In a representative passage, one appellate court stated: "Characteristic of those new techniques subject to the *Kelly* requirements of reliability and acceptance in the relevant scientific community are such devices or analyses as hypnosis-induced testimony ([*People* v.] *Shirley* [(1982)] 31 Cal.3d 18 [181 Cal.Rptr. 243, 723 P.2d 1354]), voiceprint identification (*Kelly, supra,* 17 Cal.3d at p. 30), new systems of blood typing (*Huntingdon* v. *Crowley*[, *supra,*] 64 Cal.2d [at pp.] 653-656 . . .), *the use of 'truth serum' or sodium pentothal (. . . Jones*[, *supra,*] *52 Cal.2d [at p.] 653* . . .), the use of a scanning electron microscope to detect particles of gunshot residue (*People* v. *Palmer* (1978) 80 Cal.App.3d 239, 250-255 . . .), or bite-mark identification (*People* v. *Slone* (1978) 76 Cal.App.3d 611, 619-629 . . .)." (*People* v. *Mendibles* (1988) 199 Cal.App.3d 1277, 1293 [245 Cal.Rptr. 553], italics added; see also *People* v. *Luna* (1988) 204 Cal.App.3d 726, 734 [250 Cal.Rptr. 878], disapproved on other grounds in *People* v. *Jones* (1990) 51 Cal.3d 294, 322 [270 Cal.Rptr. 611, 792 P.2d 643]; *People* v. *Adams* (1975) 53 Cal.App.3d 109, 112-113 [125 Cal.Rptr. 518]; *People* v. *Law* (1974) 40 Cal.App.3d 69, 74 [114 Cal.Rptr. 708].)

Notwithstanding the line of authority applying *Kelly* to the use of so-called truth serums such as sodium pentothal or sodium amytal, Holly contends that *Kelly* "does not apply to Holly's sodium amytal interview since it is not a new procedure. . . . [It] has been used since at least World War II and has been well-researched. . . ." We are not persuaded.

*People* v. *Cegers, supra,* 7 Cal.App.4th 988, which the trial court cited in support of its decision that *Kelly* does not apply to sodium amytal cases, is readily distinguishable. The defendant in *Cegers* was convicted by jury of

assault with a deadly weapon, use of a deadly weapon, and intentional infliction of great bodily injury. The incident occurred after the defendant, who had been drinking heavily, was abruptly awakened to find intruders in his house at 4 or 5 a.m. The intruders were actually the defendant's son and daughter-in-law, with whom the defendant earlier had had a verbal confrontation. The defendant claimed that in his confusion upon being suddenly awakened to find people in his house, he did not recognize who they were and grabbed the knives in self-defense. The jury disbelieved his story and convicted him.

On appeal in *Cegers*, the judgment was reversed due to the trial court's erroneous exclusion of a defense expert witness's testimony on sleep disorders and confusional arousal syndrome. "The syndrome is associated with people who have sleep apnea and are awakened during a period of depressed mental functioning. They are able to perform motor functions, such as walking, while still mentally asleep. In severe cases such persons can be violent, causing injury or death to others, in which event their condition has been termed 'homicidal somnambulism.' The condition is properly termed physiological rather than psychological, because it results from an anomaly of the brain. [¶] Dr. Mitler was prepared to testify that Cegers suffered from confusional arousal syndrome on the night of the assault. His opinion was based upon the oximeter test he had administered, Cegers's history (which included recitation of sleepwalking and sleep disorders), the evidence of excessive alcohol use on the night in question, and the bizarre nature of the assault itself. . . ." (*People* v. *Cegers, supra*, 7 Cal.App.4th at pp. 993-994.)

The trial court in *Cegers* had excluded Dr. Mitler's testimony under the *Kelly* test, after finding there was no substantial agreement and consensus in the scientific community regarding the reliability of the confusional arousal syndrome as a scientific method or procedure. This, the appellate court held, was error, because the syndrome was not based on a new scientific method or procedure: "The only scientific test utilized by Dr. Mitler (other than the neurologist's EEG examination, which is not in question here) was the administration of the oximeter test. The oximeter, however, is not a new scientific gadget the reliability of which is questionable. It has been used for many medical purposes other than monitoring blood oxygen content during sleep. [¶] The trial court excluded the testimony not because of the expert's use of new and untried procedures, but because the name given by the expert to the subject's condition and his diagnosis of the condition were relatively new to medical science. . . . That the name given to the malady had not yet achieved complete consensus in the psychological community cannot be a

basis for preclusion of the evidence. [Citation.]" (*People* v. *Cegers, supra*, 7 Cal.4th at pp. 999-1000.)[11]

In this case, Holly attempts to avoid the *Kelly* test by pointing out that the use of sodium amytal, like the administration of an oximeter test in *Cegers*, is not a new procedure. While sodium amytal may have long been administered to break down a person's inhibitions against revealing information, there is no expert consensus concerning the reliability of the information extracted during such a procedure. If there is a consensus regarding the reliability of a sodium amytal test, it is overwhelmingly negative. (*People* v. *Jones, supra*, 52 Cal.2d at p. 653; *People* v. *Johnson, supra*, 32 Cal.App.3d at p. 1001.) The oximeter test, on the other hand, has no similar controversy surrounding the reliability of its results. Accordingly, we distinguish *Cegers* on its facts.

Other cases in which the *Kelly* test has been held not to apply are also distinguishable. Expert testimony may be provided without regard to *Kelly* to explain, for example, the psychological factors which affect the accuracy of eyewitness identification (*People* v. *McDonald* (1984) 37 Cal.3d 351 [208 Cal.Rptr. 236, 690 P.2d 709]). There is no experimental or novel device involved in such testimony. Qualified psychologists may "simply explain to the jury how certain aspects of everyday experience shown by the record can affect human perception and memory, and through them, the accuracy of eyewitness identification testimony." (*Id.* at p. 373.) Similarly, expert testimony is admissible without regard to *Kelly* to explain the symptoms of Munchausen's syndrome by proxy, a condition whereby a parent secretly causes the child's illness in order to attract attention or sympathy (*People* v. *Phillips* (1981) 122 Cal.App.3d 69 [175 Cal.Rptr. 703]), or how an examination of a child's physical injuries led to the diagnosis of battered child

---

[11]The appellate court in *Cegers* also noted that the exclusion of Dr. Mitler's testimony could not have been based on the second line of *Kelly* cases which exclude evidence of "a psychological or motivational 'profile' to predict tendencies of a victim or accused[.]" (*People* v. *Cegers, supra*, 7 Cal.App.4th at p. 999.) Although child molestation syndrome evidence has been held inadmissible under *Kelly* to prove that a child is a dependent minor (*In re Sarah M.* (1987) 194 Cal.App.3d 585 [239 Cal.Rptr. 605]), and rape trauma syndrome evidence has been excluded as irrelevant to prove that a rape occurred (*People* v. *Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291]), the confusional arousal syndrome evidence was not based on the compilation of a profile of characteristics common to persons who unconsciously commit assault upon being suddenly awakened. As the *Cegers* court explained: "The doctor was not engaged in assembling a set of behavioral characteristics for the purpose of showing that Cegers's unusual conduct could in some way be explained. Rather, the doctor's approach was specific to Cegers, based upon a personal examination, the taking of a history, the measuring of blood levels during sleep, and a consideration of the unique facts of the assault. It was, in fact, garden variety medical/psychological testimony concerning the probable physiological defect to which Cegers was subject, a defect that would affect his mental state at the time of the assault." (*People* v. *Cegers, supra*, 7 Cal.App.4th at p. 1000.)

syndrome (*People* v. *Jackson* (1971) 18 Cal.App.3d 504, 505-508 [95 Cal.Rptr. 919]). Testimony regarding objectively verifiable physical symptoms leading to a medical diagnosis is admissible as garden variety expert testimony. "[A]n expert medical witness is qualified 'to give an opinion of the cause of a particular injury on the basis of the expert's deduction from the appearance of the injury itself.' [Citation.] Such a diagnosis need not be based on certainty, but may be based on probability; the lack of absolute scientific certainty does not deprive the opinion of evidentiary value. [Citation.]" (*People* v. *Mendibles, supra,* 199 Cal.App.3d at p. 1293.)

Unlike an analysis of the factors affecting eyewitness identification or the direct examination of a wound or injury, the use of sodium amytal to retrieve repressed memories of child sexual molestation is a scientific technique or method which is subject to the *Kelly* requirements of reliability and acceptance by the relevant scientific community. (*People* v. *Jones, supra,* 52 Cal.2d at p. 653; *People* v. *Mendibles, supra,* 199 Cal.App.3d at p. 1293; *People* v. *Johnson, supra,* 32 Cal.App.3d at p. 1001.) In this case, the patient was hospitalized, the drug was injected intravenously by a physician, and the patient was questioned by a licensed therapist. The procedure was given an aura of reliability not only by the locale and method of the interview, but by the therapist's assurances that only persons trained to lie under the drug's influence could do so. This procedure was, as a matter of law, a scientific technique, the reliability of which must be established by expert evidence to meet *Kelly*'s requirements.

Holly's assertion that *Kelly* does not apply to her sodium amytal interview because it was conducted solely for therapeutic purposes well before any lawsuit was filed is not persuasive. Holly's motive for undergoing the procedure bears no relevance to the procedure's reliability.

Having determined that *Kelly* applies to this case, we next consider whether the record contains any new evidence to indicate scientific opinion has shifted away from the consensus that sodium amytal is not a reliable truth serum. We find none in the record. As even Holly's expert witness, psychiatrist Colin Ross, stated in his declaration, "memory contamination can occur during a sodium amytal interview," and "the risk of contamination is increased."

Gary's expert witness, psychiatrist Martin T. Orne, confirmed that there remains a general consensus in the scientific community that using sodium amytal for truthfinding purposes is not a reliable technique: "It has long been recognized and accepted in the scientific community that sodium amytal is not useful in ascertaining 'truth.' Things said under the influence of sodium

amytal are no more reliable than things said while intoxicated by alcohol. Further, under the influence of sodium amytal, a patient becomes more sensitive and receptive to suggestions due to the context and to the comments of the interviewers. The process makes it more likely that a subject will respond to subtle cues and come to believe statements as true which in fact have no basis in reality. [¶] . . . Furthermore, critical judgment is largely suspended and the subject may more readily transform or distort recollections, dreams, fantasies, and create pseudomemories, which the subject may come to believe as true. The subject may also confabulate and fill in gaps of memory with largely or totally fictitious material. It is impossible to ascertain whether such 'memories' described during a sodium amytal interview have any reliability without independent corroborating evidence. . . ."

Holly asserts that even if *Kelly* applies to what she said during the sodium amytal interview, she should be permitted to testify about the alleged incidents she recalled and related before that interview. She claims to be able to prove having recalled and related, before the sodium amytal interview, alleged acts of molestation between ages five and eight. She contends she related the alleged incidents or flashbacks to Stephanie, Isabella, and Rose before the interview. Assuming she did so, Holly is not competent to testify to those events unless she had personal knowledge, before the sodium amytal interview, that the alleged abuse had occurred. (Evid. Code, § 702.) Under *Kelly*, her post-sodium-amytal testimony is inadmissible for that purpose. The burden shifting procedure of section 437c, subdivision (o)(2) required her to produce specific facts showing a triable issue as to whether she knew, before the sodium amytal interview, she had been abused. Holly failed to satisfy her burden.

Finally, we note both parties have briefed several hypnosis cases (*People v. Shirley* (1982) 31 Cal.3d 18 [181 Cal.Rptr. 243, 723 P.2d 1354]; *People v. Guerra* (1984) 37 Cal.3d 385 [208 Cal.Rptr. 162, 690 P.2d 635]; *People v. Hayes* (1989) 49 Cal.3d 1260 [265 Cal.Rptr. 132, 783 P.2d 719]) and Evidence Code section 795 (providing for the limited admissibility of matters which a witness in a criminal trial recalled and related before undergoing hypnosis for the purpose of recalling events).

In *Shirley*, a witness was hypnotized for the purpose of recalling details of the crime after she had testified at the preliminary hearing. Her posthypnotic trial testimony was held inadmissible under *Frye*, but the court did not rule out the admissibility of her prehypnotic preliminary hearing testimony in the event of a retrial. (*People v. Shirley, supra*, 31 Cal.3d at pp. 40, 66-67.) In

*Guerra,* the court held *Shirley* applies retroactively, but declined to decide whether a hypnotized witness's testimony is admissible in forms other than a preliminary hearing transcript. In *Hayes,* the court backed away from its blanket prohibition in *Shirley* against allowing a hypnotized witness to testify at trial, and held only hypnotically created testimony to be inadmissible. (*People* v. *Hayes, supra,* 49 Cal.3d at p. 1270.) *Hayes* held that if the trial court can reasonably determine the memories were not created during the hypnotic session, the witness may testify. The court stated the witness may testify "to events which the court finds she recalled and related prior to the hypnotic session, and any other . . . subjects not discussed during her hypnotic session." (*Id.* at p. 1273, fn. omitted.)

Assuming, without deciding, that *Hayes* applies to this case, we conclude, as a matter of law, that the trial court cannot reasonably determine Holly's memories were not created during the sodium amytal interview. Even though she may have recalled and related certain events before the sodium amytal interview, she was uncertain whether they were actual events until after the interview, thus rendering her memories uncertain and subject to contamination during the interview. As Dr. Orne stated, "sodium amytal is, in some aspects, even more problematic than hypnosis in its effects of producing false memories and confabulations. If the patient is concerned about sexual matters, he or she will tend to recall sexual experiences. This is likely to forever distort the memory of the subject."

As for Evidence Code section 795, which has been discussed in the context of a civil case (*Schall* v. *Lockheed Missiles & Space Co.* (1995) 37 Cal.App.4th 1485 [44 Cal.Rptr.2d 191]), it has yet to be applied to a sodium amytal case. Assuming, without deciding, that the statute applies to this case, Holly failed to meet its requirements. Her preamytal memories were not preserved in written, audiotape, or videotape form (Evid. Code, § 795, subd. (a)(2)), and the interview was not videotaped (Evid. Code, § 795, subd. (a)(3)(C)).

We hold Holly's testimony regarding the alleged abuse between ages five and eight is inadmissible under *Kelly.*

## II

Two years after the sodium amytal interview, Holly had new flashbacks which she believes are recovered repressed memories of sexual abuse by Gary when she was between 12 and 16. Gary contends Holly's testimony on

these matters is inadmissible under *Kelly* due to the lack of general acceptance in the scientific community of the reliability of memories recalled after a sodium amytal interview. We agree.

According to Dr. Orne, "any testimony of Holly Ramona regarding her alleged 'memories' of sexual molestation, from the date of the sodium amytal interview on, is inherently untrustworthy and unreliable and should be excluded from consideration in this action." We find Dr. Orne's expert opinion was sufficient to shift the burden of producing evidence to Holly, who failed to produce any rebuttal evidence on this point. Dr. Ross, Holly's sole expert on sodium amytal, did not state Holly's memories, recalled two years after the sodium amytal interview, were not affected by the drug. The gist of Dr. Ross's opinion regarding Holly's post-sodium-amytal memories was that Gary's experts had the burden of establishing their unreliability. The burden shifting procedure of section 437c, subdivision (o)(2), however, required Holly to produce specific facts showing a triable issue exists as to whether her post-sodium-amytal memories are reliable. Dr. Ross's declaration was insufficient to create a triable issue of fact. His statements that "memory contamination can occur during a sodium amytal interview," and "the risk of contamination is increased[,]" support our determination that Holly's testimony must be excluded under *Kelly*.

Gary invites us to exclude all of Holly's testimony due to the lack of general acceptance and consensus in the scientific community on whether memories of childhood sexual molestation can be repressed and, if so, whether the repressed memories can later be accurately recalled, particularly after undergoing therapy which presupposes the existence of child abuse. We decline to consider the matter at this time.[12]

---

[12]We note that the admissibility of repressed memory evidence is being addressed, with conflicting results, in other jurisdictions. In *Farris* v. *Compton* (D.C. App. 1994) 652 A.2d 49, the court held the delayed discovery rule is available to toll the statute of limitations in sexual abuse cases, but that the admissibility of the recovered repressed memories has yet to be adjudicated. In *Isely* v. *Capuchin Province* (E.D.Mich. 1995) 877 F.Supp. 1055, the court held that expert testimony regarding posttraumatic stress disorder, repressed memory, and whether the plaintiff suffered from such conditions would be admissible under the federal evidentiary reliability standard of *Daubert* v. *Merrell Dow Pharmaceuticals, Inc., supra,* 509 U.S. 579. But in *State* v. *Hungerford* (1997) __ N.H. __ [697 A.2d 916], the New Hampshire Supreme Court upheld the exclusion of the sexual assault victims' testimony in the criminal prosecutions against the alleged perpetrators, finding that the victims' recovered repressed memory testimony failed to meet the *Daubert* standard of reliability.

## DISPOSITION

We grant the petition for peremptory writ of mandate. We direct the trial court to vacate its order denying petitioner's motion for summary judgment and to issue a new and different order granting same. Petitioner is awarded costs.

Spencer, P. J., and Masterson, J., concurred.