[No. G016875. Fourth Dist., Div. Three. Feb. 16, 1999.]

JAMES TREAR, Plaintiff and Appellant, v.
JUDITH SILLS, Defendant and Respondent.

**COUNSEL**

Tom M. Allen for Plaintiff and Appellant.

Callahan, McCune & Willis and O. Brandt Caudill, Jr., for Defendant and Respondent.

Lewis, Goldberg & Ball, Michael L. Goldberg and Carolyn I. Polowy for the National Association of Social Workers as Amicus Curiae on behalf of Defendant and Respondent.

**OPINION**

**SILLS, P. J.—**

## I.   INTRODUCTION

In this case a father claims he was wrongly accused of sexually abusing his daughter because his daughter's therapist implanted the idea in her mind.

He has now sued the daughter's therapist for "professional negligence," that is, *malpractice*, despite the fact that *he* was never the therapist's patient. The case comes to us on a judgment after a demurrer without leave to amend. This court is thus faced with the question of whether the professional duty of the therapist extends beyond the patient to the patient's parent.

The answer must be no. As we explain, to extend the duty of a therapist to persons who have a relationship with the patient in the context of a perceived recovered memory of childhood sexual abuse is to saddle the therapist with a divided loyalty in an inherently adversarial situation.

## II. FACTS

The facts are simple, largely because they derive from two source documents: a complaint filed by Kathleen Searles against her father, James Trear, in January 1992, and another complaint, which is the basis of this appeal, filed by Trear against Searles's therapist, Judith Sills, in April 1994.

Kathleen Searles was born in 1945. She was adopted by plaintiff James Trear at age 12—that is, about 1957. About 35 years later, in 1992, she sued Trear for having raped and sexually abused her during her childhood years, but she claimed that she had no memory of it until 1991, when defendant Judith Sills diagnosed her—negligently, according to Trear—as suffering from "body and cell memories" of childhood sexual abuse beginning at age six months.[1] Sills encouraged Searles to file her suit and otherwise take "punitive action" against her father. Searles has continued to claim that Trear had abused her until at least July 1993 (and perhaps beyond), and there is no indication in the papers that Searles has recanted her recovered memory.[2] In April 1994 Trear sued Sills for professional negligence, alleging that had she exercised reasonable care, she would have foreseen the harm to Trear resulting from the diagnosis.[3] Sills's demurrer was sustained without leave to amend, and Trear now appeals from the ensuing judgment of dismissal.

---

[1]Neither Searles's complaint against Trear nor Trear's complaint against Sills explains how she could have been adopted at age 12 yet abused as early as 6 months.

[2]The complaint makes a reference to Searles maintaining her claim that she was abused up to at least July 1993; we take the reference as a simple drafting device to show that Trear's suit was timely, i.e., brought within one year of harm which he had sustained.

[3]The complaint actually never asserts in so many words that the diagnosis was in fact false. As the case comes to us after a demurrer, we must assume, as a natural inference from the facts alleged, the falsity of the allegation against Trear.

### III. DISCUSSION

#### A. *Absent Agreement, a Psychotherapist Has No Duty to the Parent of an Adult Patient[4] Regarding Allegedly False Recovered Memories of Childhood Sexual Abuse*

##### 1. *Preliminary Observations Concerning the Recovered Memory Controversy*

■ The idea that childhood sexual abuse may result in suppression of memory such that the victim may not remember it until many years later under the guidance of a psychotherapist is, to say the least, a controversial one *within* the psychotherapeutic community.[5] Much of the force of the idea originated with one book, The Courage to Heal (1992), by Ellen Bass and Laura Davis, which traces a variety of psychological disorders to unremembered early childhood sexual abuse.[6] The high-water mark of acceptance of the theory appears to have been the adoption by many state legislatures, including California's, of special, relaxed statutes of limitations which implicitly accept the idea that a victim of sexual abuse may not have reason to know of the abuse until many years after its occurrence.[7] In our state, section 340.1 of the Code of Civil Procedure, first enacted in 1986, allows a civil action for childhood sexual abuse within three years from "the date the plaintiff discovers or reasonably should have discovered that psychological injury or illness occurring after the age of majority was caused by the sexual abuse." (See Code Civ. Proc., § 340.1, subd. (a).)[8]

---

[4]We confine our decision and observations to situations involving an *adult* patient because in cases where the patient is a minor child there is the problem of just exactly who hired the therapist and to whom the therapist's duty runs. (Cf. *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583 [257 Cal.Rptr. 98, 770 P.2d 278].)

[5]See Note, *A Claim for Third Party Standing in Malpractice Cases Involving Repressed Memory Syndrome* (1995) 37 Wm. & Mary L.Rev. 337, 346 (hereafter, Wm. & Mary Note) ("Therapists themselves disagree about the validity of recovered memories."); see also Finer, *Therapists' Liability to the Falsely Accused for Inducing Illusory Memories of Childhood Sexual Abuse—Current Remedies and a Proposed Statute* (1997) 11 J. L. & Health 45, 47 (hereafter, Finer Article) (no issue in law and psychiatry has engendered such controversy).

[6]See Finer Article, *supra*, 11 J. L. & Health at page 83 ("the 'bible' of the movement, The Courage to Heal by Ellen Bass and Laura Davis, advises therapists that '[i]f sexual abuse isn't the presenting problem but your client has eating disorders, an addiction to drugs or alcohol, suicidal feelings, or sexual problems, these may be symptoms of sexual abuse'").

[7]See Comment, *True or False: Expert Testimony on Repressed Memory* (1995) 28 Loyola L.A. L.Rev. 1345, 1355 ("To date at least twenty-one states have enacted special statutes of limitations for claims of child sexual abuse.").

[8]The statute, to be sure, contains a number of substantive safeguards, including a requirement for a certificate of merit from a licensed mental health practitioner when the plaintiff

As the end of the 20th century approaches, however, recovered memory theory finds itself on the intellectual defensive. In 1992 a group of families torn asunder by false accusations of child abuse formed the False Memory Syndrome Foundation to combat the idea.[9] Commentators have noted that the pendulum is now swinging the other way.[10] Many psychotherapists now see recovered memory theory as a " 'widespread and . . . damaging' fad."[11] And, indeed, the case against the idea that someone may so repress a memory of sexual abuse that he or she will have no awareness of it until adulthood is formidable[12]—so formidable in fact that we doubt (though we stress we do not decide the point now) that recovered memory will pass muster under the *Kelly* test (formerly the *Kelly-Frye* test[13]) for admissibility.[14] An oft-cited example of the dubiousness of certain memories is that of Jean Piaget—*the* Jean Piaget, the famous developmental psychologist—who vividly remembered a man trying to kidnap him as a child, his nurse fighting bravely, and even the scratches she received on her

---

(like Searles here) is 26 years or older, in camera review of that certificate *before* service, anonymity for the defendant by means of "Doe" pleading, and confidentiality by means of keeping the court records under seal. (See Code Civ. Proc., § 340.1, subds. (d), (e), (g) & (j).)

[9]See MacNamera, *FADE AWAY The Rise and Fall of the Repressed Memory Theory in the Courtroom* (Mar. 15, 1995) Cal.Law. 36, 41 ("the foundation has become a credible source for debunking the theory of repressed memory, if only because of the highly regarded psychiatrists, psychologists, and others who have aligned themselves with the organization").

[10]See Finer Article, *supra*, 11 J. L. & Health at page 47.

[11]See Wm. & Mary Note, *supra*, 37 Wm. & Mary L.Rev. at page 379, quoting Richard Ofshe & Ethan Watters, Making Monsters: False Memories, Psychotherapy and Sexual Hysteria (1994) at page 5.

[12]E.g., Wm. & Mary Note, *supra*, 37 Wm. & Mary L.Rev at pages 343-344, footnote omitted ("[I]n 1974, David S. Holmes published a study in which he concluded that no reliable evidence for repression exists. . . . [¶] . . . In studies of children who experienced traumatic events, researchers found that some children distorted the memory, but none forgot. . . . [¶] . . . For example, an analysis of 133 school children attending school when a sniper fired shots onto the school playground showed substantial changes in their memories within a short time. Children who were not even outside at the time vividly remembered standing close to the playground when their schoolmates were injured."); Finer Article, 11 J. L. & Health at pages 74 ("The 'pristine,' 'frozen mammoth' hypothesis of repressed memories is without scientific or systematic empirical evidence to support it.") and 80 ("The problem, most authorities conclude is not that victims of traumatic experiences cannot remember, but that they cannot forget!").

[13]The evolution of the name of the test in California for the admissibility of scientific evidence from *Frye* to *Kelly-Frye* to *Kelly* has been nicely traced in *Ramona* v. *Superior Court* (1997) 57 Cal.App.4th 107, 116-117 [66 Cal.Rptr.2d 766].

[14]Recovered memories of sexual abuse by parents induced by "truth serums" such as sodium pentothal or sodium amytal have already failed to meet the *Kelly* requirement of general acceptance within the relevant scientific community. (*Ramona* v. *Superior Court, supra,* 57 Cal.App.4th 107, 121 [no evidence in record to indicate that the consensus of scientific opinion had "shifted away from the consensus that sodium amytal is not a reliable truth serum"].) The same goes for recovered memories induced by hypnosis. (Cf. *Schall* v.

face in the scuffle. The problem was, when Piaget was age 15 his nurse confessed that the whole story had been fabricated.[15]

### 2. Simple Foreseeability of Harm Does Not Establish a Duty on the Part of the Therapist to the Parent of an Adult Patient in the Recovered Memory Context

It takes very little imagination to recognize the damning horror that must ensue to a parent *falsely* accused of child molestation. (Cf. *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1752 [53 Cal.Rptr.2d 687] ["Few crimes carry as much (or as much deserved) social opprobrium as child molestation."].) At the same time, there is a substantial body of

---

*Lockheed Missiles & Space Co.* (1995) 37 Cal.App.4th 1485, 1492-1493 [44 Cal.Rptr.2d 191] [recovered memory of comments by supervisor alleged to constitute sexual harassment induced by hypnosis properly held inadmissible].)

The general question of "repressed memory evidence" has not yet been squarely addressed in California, though the *Ramona* court noted it has been in other jurisdictions. (*Ramona* v. *Superior Court, supra*, 57 Cal.App.4th at p. 124, fn. 12.) From what those jurisdictions have concluded, however, it appears highly unlikely that such evidence commands anything close to the necessary general acceptance within the relevant scientific community to pass *Kelly*. (See *State* v. *Walters* (1997) 142 N.H. 239 [698 A.2d 1244, 1247] [no "general acceptance of the phenomenon in the psychological community"]; *State* v. *Hungerford* (1997) 142 N.H. 110 [697 A.2d 916, 925-926] ["The psychological community remains deeply divided on the reliability or accuracy of recovered memories."]; *Peterson* v. *Huso* (N.D. 1996) 552 N.W.2d 83, 84, fn. 1 [noting one commentator's assertion that the American Medical Association, American Psychological Association, and American Psychiatric Association do not find recovered memories necessarily reliable]; *K. B.* v. *Evangelical Lutheran Church* (Minn.Ct.App. 1995) 538 N.W.2d 152, 157, fn. 1 ["We note the emerging conflict in the psychiatric community over the validity of discovered memories of sexual abuse."].)

Two federal district courts have, however, held repressed memory evidence admissible under the federal *Daubert* standard (see *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 [113 S.Ct. 2786, 125 L.Ed.2d 469]), both relying on a single expert's testimony that there *was* a consensus in favor of recovered memory. (See *Shahzade* v. *Gregory* (D.Mass. 1996) 923 F.Supp. 286, 288 [relying on testimony of Dr. Bessel van der Kolk that "majority of *clinical* psychiatrists recognize the theory of repressed memories"]; *Isely* v. *Capuchin Province* (E.D.Mich. 1995) 877 F.Supp. 1055, 1065 [relying on testimony of Dr. Carol Hartman that ". . . there is a fair degree of acceptance of the concept of repressed memory in the field" and "the majority of clinicians accept the concept"].)

[15]See Wm. & Mary Note, *supra*, 37 Wm. & Mary L.Rev. at pages 344-345. Proponents of recovered memory, however, have their own famous counterexample. They point to an ex-priest, James Porter. It was not until 1989 that one of his former victims recovered initial memories of sexual abuse from the 1960's; after that, many other victims of Porter's abuse came forward. (See Bowman & Mertz, *A Dangerous Direction: Legal Intervention in Sexual Abuse Survivor Therapy* (1996) 109 Harv. L.Rev. 549, 610 (1996) (hereinafter, Bowman & Mertz Article).)

evidence that many recovered memory claims are—as indeed the very procedural posture of the present case forces us to accept—factually false.[16] Accordingly, there is the judicial temptation to allow parents damaged by recovered memory claims a tort recovery in professional malpractice based on the obvious foreseeability of the harm to the parent from the "false" memory.

Thus it is not surprising that courts which consider simple foreseeability to be the test for the duty element in the tort of negligence have easily ruled in favor of allowing suits such as this one to go forward. (E.g., *Wilkinson* v. *Balsam* (D.Vt. 1995) 885 F.Supp. 651, 660 ["If the factfinder determines that harm to Wilkinson was foreseeable in the circumstances, then Balsam owed a legal duty to Wilkinson to conform his conduct to the appropriate standard of care."]; *Sullivan* v. *Cheshier* (N.D.Ill. 1994) 846 F.Supp. 654, 662 ["It would be hard to doubt that the family relationship would be seriously and negatively affected in this situation," and thereby denying defendant summary judgment as to malpractice count]; *Montoya by Montoya* v. *Bebensee* (Colo.Ct.App. 1988) 761 P.2d 285, 288-289 ["Certainly, the harm that may result from negligent false accusations is readily foreseeable, while the burden of due care placed upon therapists is no greater than the duty that substantially all professionals are required to meet."]; *S.* v. *Child & Adolescent Treatment* (1994) 161 Misc.2d 563 [614 N.Y.S.2d 661, 666] ["it requires little imagination to see the harm that might result from a

---

[16]One of the disturbing aspects of the recovered memory debate that surfaces here and there in the legal literature is that some therapists may consider the actual *truth* of a revelation of child molestation less important than the fact the *patient* confronts *a* memory of sexual abuse, imagined or not. See Finer Article, *supra*, 11 J. L. & Health at page 71: "Some recovered memory therapists or writers may be purporting to embrace the therapeutic premises of certain schools of psychotherapy which find therapeutic value in narrative, inter-psychic truth that fits and is therapeutically effective for a given patient under given conditions, regardless of historical truth." Translation: some therapists don't care if a recovered memory of child molestation is false, as long as the very act of having the false memory and confronting it helps. The Washington Supreme Court noted a similar tendency among some therapists in *Tyson* v. *Tyson* (1986) 107 Wn.2d 72 [727 P.2d 226], dealing with the application of the statute of limitations in a recovered memory case brought by a child against her father: "The purpose of emotional therapy is not the determination of historical facts, but the contemporary treatment and cure of the patient. We cannot expect these professions to answer questions which they are not intended to address." (*Id.* at p. 229.) See also Kisch, *From the Couch to the Bench: How Should the Legal System Respond to Recovered Memories of Childhood Sexual Abuse?* (1996) 5 Am. U. J. Gender & L. 207, 222-223 (hereafter, Kisch Article) (contrasting purpose of therapeutic hypnosis—which is *not* "to discover the truth of past events, but rather to discover the patient's perceptions of past events" with forensic hypnosis, which *is* "to discover the truth").

negligently and erroneously formed conclusion that sexual abuse had occurred"].)[17]

In California, however, as our Supreme Court has taken great pains to emphasize, duty is *not* a function of simple—or perhaps simpleminded would be the better—foreseeability. Or, as Witkin often said, "On a clear day you can foresee forever." In *Thing* v. *La Chusa* (1989) 48 Cal.3d 644, 668 [257 Cal.Rptr. 865, 771 P.2d 814], our Supreme Court directly rejected simple foreseeability as the test of duty.[18]

In the case before us, we are not dealing with the patient's own cause of action against a therapist, but with a patient's *parent's* cause of action for professional malpractice asserted in the absence of any professional duty having been voluntarily assumed toward the parent. Thus any duty toward the *parent* must be imposed upon the relationship as a matter of policy; certainly no duty was created by *agreement*. This case is thus quite distinguishable from cases where a psychotherapist has been held to have a duty toward a patient's parent based on the voluntary assumption of a duty toward the parent as well as the patient. (E.g., *Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc., supra,* 48 Cal.3d at p. 591 ["It bears repeating that the mothers here were the patients of the therapist along with their sons, and the therapist's tortious conduct was accordingly directed against both."]; accord, *Burgess* v. *Superior Court* (1992) 2 Cal.4th 1064, 1076 [9 Cal.Rptr.2d 615, 831 P.2d 1197] [obstetrician had duty to both pregnant woman and her baby].) By the same token this case is also distinguishable from a malpractice suit brought by the patient directly against his or her therapist. In such a case, the therapist has by definition undertaken a duty to help the patient, so there is no question as to whether a court, as a matter of common law, should impose a duty beyond what the therapist has already done voluntarily.

---

[17]We explain below why these cases are unpersuasive; for the moment suffice to say that they deal much too superficially with the nature of psychotherapy in the context of recovered memory.

[18]*Thing* was adumbrated by *Borer* v. *American Airlines, Inc.* (1977) 19 Cal.3d 441 [138 Cal.Rptr. 302, 563 P.2d 858], decided some 12 years earlier, which noted that simply because there is "foreseeable injury to a legally recognized relationship" does not "necessarily postulate a cause of action." (*Id.* at p. 446.) In explaining why children do *not* have a cause of action for loss of consortium arising out of injuries to their parent, Justice Tobriner, writing for the *Borer* court, stated that ". . . social policy must at some point intervene to delimit liability." (*Ibid.*) The same principle was then applied, in a companion case to *Borer*, to *preclude* a parent from recovering for the loss of a child's consortium. (See *Baxter* v. *Superior Court* (1977) 19 Cal.3d 461, 464 [138 Cal.Rptr. 315, 563 P.2d 871] [*Borer* applies to parental claims for loss of filial consortium].)

### 3. *Because of the Inherently Adversarial Nature of the Therapeutic Problems Posed by Possible Childhood Sexual Abuse, the Therapist's Duty Cannot Extend to a Possible Abuser*

#### a. *The Internal Debate Within the Therapeutic Community About the Extent of Childhood Sexual Abuse*

The debate concerning repressed memory of childhood sexual abuse has been ongoing for at least the last 100 years.[19] It is well reported, for example, that Sigmund Freud *initially* concluded that "hysteria" was the result of childhood sexual abuse, but he soon recanted that view, and the dominant, "orthodox" mainstream of the psychoanalytic profession rejected, for the better part of the 20th century, Freud's initial position. (See, e.g., Phipps, *Children, Adults, Sex and the Criminal Law: In Search of Reason* (1997) 22 Seton Hall Legis. J. 1, 78 (hereinafter, Phipps Article); Bronitt & McSherry, *The Use and Abuse of Counseling Records in Sexual Assault Trials: Reconstructing the 'Rape Shield'?* (1997) 8 Crim. L.F. 259, 265; Dougherty, *Evaluating Recovered Memories of Trauma as Evidence* (Jan. 1996) 25 Colo. Law. 1, 1 (hereinafter, Dougherty Article); Comment, *Childhood Sexual Abuse, Repressed Memories and Corroborating Evidence: One Burden is Enough: L.C. v. A.K.D.* (1996) 1 Widener L. Symp. J. 465, 498 (hereinafter, Widener Comment); Henderson, *Without Narrative: Child Sexual Abuse* (1997) 4 Va. J. Soc. Pol'y & L. 479, 488.) Indeed, it was a *contemporary* of Freud's, Jean-Martin Charcot, who was the first therapist to be accused of "planting" false memories of abuse in his clients. (Dougherty Article, *supra*, 25 Colo. Law. at p. 1.)

However, by the late 1970's and 1980's, there was a resurgence of Freud's initial view that childhood sexual abuse was at the root of many if not most psychological ills. (See, e.g., Phipps Article, *supra*, 22 Seton Hall Legis. J. at p. 80 ["In spite of the pervasive influence of Freud and Kinsey, a dramatic increase in scientific research examining the causes and effects of child abuse and neglect began in the early 1980s."]; Widener Comment, *supra*, 1 Widener L. Symp. J. at p. 499 ["Since that time, the mental health community has come to acknowledge the extraordinary number of childhood sexual abuse cases"].)

In the wake of that resurgence, as we have noted above, many state legislators enacted special statutes of limitations to accommodate the repression of memories, and in the wake of that accommodation, a reaction has

---

[19]"[T]he contours of the debate about the validity of 'repressed' memory," note Professors Bowman and Mertz, "follow the contours of the debates in other areas of psychology." (Bowman & Mertz Article, *supra*, 109 Harv. L.Rev. at p. 625.)

developed. Fascinatingly enough, some commentators have even seen in the current debate over repressed memory a *replay* of the struggle for Freud's professional soul fought in turn-of-the-century Vienna: "In an intriguing replay of the events of late nineteenth-century Vienna, the modern-day psychological profession and the media have, in recent years, first uncovered, and then to some degree renounced, child sexual abuse as a widespread source of adult psychological illness, particularly when the adult has recovered forgotten or repressed memories of abuse." (Bowman & Mertz Article, *supra*, 109 Harv. L.Rev. at p. 618.)

To the degree that the California Legislature has taken sides in the debate, it has explicitly recognized the possibility that there will be genuine cases of recovered memory of childhood sexual abuse which, despite the skepticism with which many in the therapeutic community view the idea of repressed memory, *may* still be compensated in the civil courts.[20] No other conclusion can be drawn given section 340.1 of the Code of Civil Procedure, which, as we have seen, allows for a relaxed statute of limitations in such cases. (See also *Sellery v. Cressey* (1996) 48 Cal.App.4th 538, 546-547 [55 Cal.Rptr.2d 706] [noting that the author of amendment to section 340.1 to toll statute of limitations until discovery believed that generally a person would only come to a meaningful understanding of past abuse upon entering therapy].)

### b.   *A Therapist Should Not Be Required to Serve Two Masters*

Manifestly, the duty of therapists to exercise due care runs to the patients who hire them: Here, Judith Sills's duty certainly ran to Kathleen Searles if it ran to anybody.

In the context of that duty, the Legislature has put its imprimatur on the idea that there will be instances of repressed memory of childhood sexual abuse which therapy will uncover. (Cf. *Sellery v. Cressey, supra*, 48 Cal.App.4th at p. 545 [noting adoption by courts of "more liberal view of delayed discovery in sexual abuse cases" in wake of section 340.1 of the Code of Civil Procedure].)

A corollary of the idea is that therapists certainly have the right to at least *explore in good faith* the possibility of abuse by a parent. The uncovering of that abuse, however, has certain logical implications: "Discovery" of past sexual abuse necessarily entails the probable destruction of the patient's relationship with that parent.

---

[20] For purposes of this opinion, we need not tackle the problem of reconciling the Legislature's determination with the common law standards for the acceptance of scientific evidence under the *Kelly* test (see fn. 14, *ante*).

Duty as an element of traditional negligence law is ultimately a matter of policy. (*Marlene F.* v. *Affiliated Psychiatric Medical Clinic, Inc., supra*, 48 Cal.3d at p. 588.) The issue presented by a claim of a duty to the potential "third party" abuser is to what degree therapists necessarily become *insurers* of the truth of any diagnosis of childhood sexual abuse by a parent. We say "insurers" because a moment's reflection will demonstrate the perilous position in which any such duty would put the therapist. The therapist risks utter professional failure in his or her duty to the *patient* if possible childhood sexual abuse is ignored. On the other hand, if the heinous crime of (recently discovered) childhood sexual abuse really is the cause of the patient's disorders, then it is virtually inevitable that the alleged abuser will suffer "harm."[21]

Of course, it can be argued that no patient is well served by an *incorrect* "diagnosis" of childhood sexual abuse hitherto supposedly repressed in the memory: One might surmise that the legal solution is to use the law of negligence to impose discipline on the therapist to *get the diagnosis right*. But in the context of what must necessarily be an inquiry involving at least a potentially adversarial relationship, that so-called "solution" would be unrealistic in the extreme.

Therapy, of course, is not an exact science. (See *Bird* v. *W.C.W.* (Tex. 1994) 868 S.W.2d 767, 769.) As the Texas Supreme Court has noted in this very context, there are limits to the verifiability of abuse claims. (See *ibid.*) Unless there is photographic evidence or contemporaneous medical evidence of events *which may have happened decades before*, the matter is likely to turn on the vicissitudes of human memory, in a context in which, as of this late date, there are vigorous competing views among experts.[22]

The very inexactitude of the therapeutic enterprise puts the good faith therapist in an untenable position if a duty is imposed upon him or her toward the patient's possible abuser. It would subject the therapist to inherently conflicting incentives, to the detriment of the patient. The *patient* would be denied the benefit of the nonquantifiable aspects of the therapist's

---

[21]And this is true regardless of whether the recovered memory is, in fact, true or false. Either the third party will have suffered a false accusation or will have been caught for a crime that was previously undiscovered.

[22]One expert often associated with a more skeptical viewpoint on human memory, Dr. Elizabeth Loftus (cf. *People* v. *Sanders* (1995) 11 Cal.4th 475, 508 [46 Cal.Rptr.2d 751, 905 P.2d 420]) wonders if it will ever be possible to separate false recovered memory from the truth. (See Loftus & Ketcham, The Myth of Repressed Memory: False Memories and Allegations of Sexual Abuse (1994) at p. 175 [suggesting that there may be " 'no structural difference' " between "believed-in fantasy about the past and viable memory of the past" ascertainable to clinicians].)

diagnosis: the "feel" that is conveyed by personal contact (as all trial lawyers who work with juries can appreciate), the gray subjective sense of the person that is part of the therapist's professional training, and the discretionary and judgment calls involved in determining whether a given patient really was abused. A duty to a potential abuser affords the therapist no "leeway" in deciding whether the patient really was abused: It would put the therapist in the position of a jury called upon to make a determination according to well-established and predetermined rules of evidence, rather than as a "helping" professional—except that, unlike judges and juries, the therapist would face personal liability if the determination were wrong. Either way.

There is no truth machine which allows one to determine whether the so-called recovered memory of abuse is accurate. If there were, judges and juries would no doubt like to have one when, in certain contexts, they must decide the merits of an abuse claim (e.g., *Sellery* v. *Cressey, supra*, 48 Cal.App.4th 538). And no doubt therapists would like to have one too, as it would make their work easier. But, like judges and juries, ultimately the diagnosis (or finding of fact) comes down to a subjective assessment of credibility, something rather less susceptible to verification and objective proof than the terms of a contract, depressed levels of some chemical in the blood, or reading a syphilis test wrong (cf. *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518]).

Indeed, the law would hardly impose upon a *lawyer* the duty to refrain from negligently doing harm to his or her client's adversary. (E.g., *Norton* v. *Hines* (1975) 49 Cal.App.3d 917, 921 [123 Cal.Rptr. 237].) An attorney is not even required to believe that his or her client would prevail in a court of law in order to avoid liability for malicious prosecution—a sin rather more grievous than mere negligence. If an attorney who cannot know the absolute truth of a client's position has no duty in negligence toward the client's adversary, how much less of a reason is there to impose a duty on a therapist, who must, by necessity, choose between possible harm to a patient if a recovered memory story is not believed and harm to a possible abuser if the patient's recovered memory story is believed. If therapists are to be put in what is so obviously an untenable position, it should be by the Legislature, not the legal fiat of appellate judges.

The limits of verifiability are well illustrated by the relatively recent case of *Ramona* v. *Superior Court, supra*, 57 Cal.App.4th 107, which involved a child's lawsuit against her parent for childhood sexual abuse (not the parent against her therapist for a false memory of same). Essentially, the child's first set of memories were prompted by the administration of a so-called

"truth serum," specifically sodium amytal. The accused father's summary judgment motion in his daughter's suit against him was denied but the appellate court stepped in and granted his writ petition and ordered it, precisely because the drug was unreliable. The daughter's drug-induced recollection of abuse was inadmissible. (See *id.* at p. 123.) Further, because the father presented unrebutted expert evidence that any testimony regarding childhood sexual abuse after the administration of the drug was inherently untrustworthy, summary judgment was appropriate. (See *id.* at pp. 124-125.) If there is a moral to the story for this case, it is again that there is no truth machine by which therapists can verify what appears to be a case of repressed memory.

No California case has yet to consider the precise question that is before us now. Out-of-state cases which have allowed such suits to go forward, and commentators who favor tort liability, however, have invariably not come to grips with the impossibility of verification and the conflicts of interest that a duty to a possible abuser creates.

In *Wilkinson*, for example, the court wrote about the "negligent evaluation, diagnosis and treatment" of the patient without ever explaining how one kind of psychotherapy can be "negligent," when another is not. (See *Wilkinson* v. *Balsam, supra*, 885 F.Supp. at p. 660.) The same may be said for *Sullivan* v. *Cheshier, supra*, 846 F.Supp. at page 662 (assuming a jury could find that the defendant has "intentionally or recklessly implanted" false memory in patient); *Montoya by Montoya* v. *Bebensee, supra*, 761 P.2d at pages 289-290 (assumption that therapist will use "due care" in "formulating any opinion upon which" a report or recommendation is based); and *S.* v. *Child & Adolescent Treatment, supra*, 614 N.Y.S.2d at page 666 (assumption that harm will result from "negligently and erroneously formed conclusion that sexual abuse had occurred"). These cases indulge in nothing more than slapping conclusory legal labels on the *results* of a course of psychotherapy: It must have been "negligent" because it produced within the patient a false memory of sexual abuse which foreseeably could damage the person falsely accused of the abuse. These courts assume a level of ascertainability and verifiability on the part of the therapist which is unrealistic, and which—as unwitting ganders taking their cue from witting geese—they would *never* seriously consider imposing on judges or juries for incorrect factual determinations concerning the factual merits of repressed memory claims.[23]

---

[23]Some commentators are guilty of making the same assumption. (E.g., Note, *Has Time Rewritten Every Line?: Recovered-Memory Therapy and the Potential Expansion of Psychotherapist Liability*, 53 Wash. & Lee L.Rev. 763, 796 [reference to "negligently utilizing recovered-memory therapy"].)

Indeed, in what is perhaps the most thoughtful of the pro-liability commentaries on the point, Professor Finer explicitly confronted the problem of when a therapist can recognize

#### 4. *California Case Law Is Not to the Contrary*

Discussions of psychotherapist liability have a way of invariably coming round to our Supreme Court's famous decision in *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166]. *Tarasoff* involved a case where a mental patient at a university hospital "confided" to a psychologist employed at the hospital an "intention" to kill a particular person, yet the psychologist's superior directed that no further action be taken to detain the patient. After the patient killed the person he said he would kill, her parents sued the university and the therapists involved. Because the pleadings did *not* raise *any* question as to the failure of the defendant therapists to *in fact* predict the patient's violent behavior—as the court emphasized—the court held that the therapists could be held liable for not exercising reasonable care to protect the victim from the danger. (*Id.* at pp. 438-439.) Said the high court: "In our view, however, once a therapist does *in fact* determine, or under applicable professional standards reasonably should have determined, that a patient poses a serious danger of violence to others, he bears a duty to exercise reasonable care to protect the foreseeable victim of that danger." (*Id.* at p. 439, italics added.)

For his part, Justice Mosk registered a protest at the ease with which the *Tarasoff* majority casually assumed that "applicable standards of care" could be used to determine whether a therapist "should" have been able to ascertain that a patient posed a danger.[24] Even so, it is undeniable that the *Tarasoff* majority predicated its decision on the assumption that a statement of intention to do violence was a matter of fact—sufficiently *falsifiable* as it were—so as to constitute a matter of empirical verifiability. There is no doubt that the court's conclusion flowed from the premise that a therapist could "in fact determine" that a particular patient posed a threat to a "foreseeable" victim.

That assumption most assuredly cannot be carried over to the great recovered memory debate *within* the psychotherapeutic profession. There is

that he or she is violating a duty to a third person not a client in the area of recovered memory. (See Finer Article, *supra*, 11 J. L. & Health at p. 124 [confronting Professor Wexler's view that ". . . any rule imposing liability on psychotherapists should encompass a readily discernible triggering point"].) And yet the best he could come up with was essentially a *legislative* (as distinct from judicially created) solution: He proposes a *statute* to the effect that a therapist may be liable for "hypersuggestive techniques." (*Ibid.*)

[24]"I cannot concur, however, in the majority's rule that a therapist may be held liable for failing to predict his patient's tendency to violence if other practitioners, pursuant to the 'standards of the profession,' would have done so. The question is, what standards? . . . . [P]sychiatric predictions of violence are inherently unreliable." (17 Cal.3d at p. 451 (conc. & dis. opn. of Mosk, J.).)

a huge difference between, on the one hand, a specific, identifiable patient who announces an intention to kill a specific identifiable human being, and a matter of great academic and practical controversy within a profession, which is itself not subject to easy verification.

Of course, to the degree that *Tarasoff* stands for a *methodology* in evaluating therapist liability, i.e., a set of factors to be applied, our result is thoroughly consistent with it. The *Tarasoff* court used the traditional factors employed by our Supreme Court since *Biakanja* v. *Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358] to determine the existence of a duty as part of the tort of negligence: foreseeability of the harm to the plaintiff, the degree of certainty the plaintiff suffered the injury, the closeness of the connection between the·defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with the resulting liability for breach, and the availability, cost and prevalence of insurance for the risk. (See *Tarasoff* v. *Regents of University of California, supra,* 17 Cal.3d at p. 434.)

These factors count decidedly against extending the therapist's duty to third parties in the recovered memory context. The factors of foreseeability and certainty of the harm do not favor liability because of the inherent problem of verifiability. It is manifestly unfair to predicate liability on the idea that the therapist can foresee the virtually certain harm to the accused *parent* when the harm to the *patient* from *failing* to diagnose childhood sexual abuse as the cause of the patient's ills is just as foreseeable.

Likewise the factors of moral blame, preventing future harm, not imposing an undue burden on the defendant, and the consequences to the community disfavor extension of a duty to an adverse third party. Granting the premise that a patient's symptoms (e.g., an eating disorder) *might* be the result of the suppressed trauma of child molestation (as the Legislature certainly has), there is no moral blame in a therapist seeking to confront it. The policy of preventing future harm certainly doesn't cut in favor of liability, because there is at least as much harm if the therapist errs in *not* diagnosing a true case of childhood sexual abuse as there is in diagnosing a false case of it—the harm just gets visited on the therapist's patient, not a third party. Moreover, given the problem of unverifiability and the role that the possibility of early childhood sexual abuse has played in the history of psychotherapy (e.g., the early Freud), it would be an *undue* burden on therapists to force them into a position where they must be 100 percent accurate in every case. "Defensive" therapy practiced under the sword of liability if a therapist

is wrong about a recovered memory can hardly serve the person to whom the therapist's duty unquestionably does run: the patient. And by the same token the consequences to the community of imposing a duty running to third parties means a disincentive to diagnose and remedy the serious social ill of child molestation by the very profession best suited to remedy it.[25]

As to the closeness of the connection between the conduct and the harm: We are once again back to the inherent conflict problem: Of course a diagnosis to a patient that he or she was abused by a parent is going to cause that parent harm. But in the absence of the kind of easy verifiability we usually associate with blood tests and sponge counts in surgery, the therapist has no choice. If his or her professional judgment is that the patient really was molested as a child, it would only chill the therapist's ability to treat the patient to force him or her to guarantee the accuracy of the recovered memory of molestation. There are few enough certainties in this world and psychotherapy is not an area where one is likely to find many of them.

Besides *Tarasoff*, *James W. v. Superior Court* (1993) 17 Cal.App.4th 246 [21 Cal.Rptr.2d 169] is sometimes mentioned as authority for imposing liability on therapists for allegedly false recovered memories. But *James W.* stands for no such thing. *James W.* had nothing to do with recovered memory. Rather, the case arose out of one of the worst cases imaginable of a false accusation of child abuse against a father resulting after an *actual rape*. (See *James W., supra*, 17 Cal.App.4th at p. 248.)

In *James W.*, the eight-year-old victim of an actual attack was placed in temporary foster care by social workers; one social worker referred the *family* to a private family counselor. The private family counselor developed an idée fixe that the father had perpetrated the crime and actually encouraged the child to accuse him. After more than a year of prodding by the counselor, the child relented and did accuse her father of the crime. However, DNA tests conclusively proved his innocence. Naturally he sued the counselor. The counselor contended that a *reporting* statute, the Child Abuse and Neglect Reporting Act (Pen. Code, § 11164 et seq.), immunized her. She lost

---

[25]Psychologists and marriage, family and child counselors are mandated reporters under the Child Abuse and Neglect Reporting Act (Pen. Code, § 11164 et seq.; see Pen. Code, § 11165.8, subds. (a) & (b).) *People* v. *Stritzinger* (1983) 34 Cal.3d 505, 512 [194 Cal.Rptr. 431, 668 P.2d 738] observed that ". . . the Legislature intended the child abuse reporting obligation to take precedence over the physician-patient or psychotherapist-patient privilege." Because the present case deals with whether the therapist has a duty to a possible third party abuser who is not the therapist's patient—and does not deal with whether the therapist has a duty to his or her own patient—any disincentive created by the reporting statute on the part of the *abuser* to seek help as a patient for having perpetrated child abuse is irrelevant to our analysis.

the argument, for the obvious reason that her activities took place for a considerable period of time *after* the crime had been reported. (See *James W. v. Superior Court, supra*, 17 Cal.App.4th at p. 254.)

Clearly, it would be a misreading of *James W.* to say that it allows for liability against a therapist any time there is a false accusation of molestation which the therapist believes. The case stands, rather, for the less sweeping proposition that the statutes which are designed to protect reporters of suspected child abuse do not shield family counselors from liability to those who hire them.

## B. *Other Theories of Liability?*

### 1. *No Intentional Infliction of Emotional Distress*

In light of the foregoing, we may dispense with the claim for professional malpractice based on negligence. The question arises, however, as to whether Trear has alleged facts which might constitute some other cause of action. Some commentators have asserted, for example, that recovered memory cases should be categorized as actionable under the tort of intentional infliction of emotional distress. (E.g., Finer Article, *supra*, 11 J. L. & Health at p. 111.)

Intentional infliction of emotional distress is most certainly *not* suited to the perceived abuse of a false diagnosis of sexual abuse based on allegedly recovered memory. Again, the problem of the inherent conflict imposed on the therapist in the context of a nonverifiable diagnosis of child molestation is dispositive.

Those practitioners who believe in recovered memory also honestly believe that they are doing good, not ill, by confronting their patients with the fact of repressed sexual abuse. Granting the early Freudian assumption (as distinct from the later-Freudian assumption) that abuse is widespread and the root cause of most dysfunction, it is simply not outrageous for a therapist to act on that premise.

Outrageousness might perhaps occur, for example, when a therapist, with the *intent* to do a parent harm, maliciously implants in his or her patient's mind the deliberately false idea that the patient's parent molested him or her as a child, much like, in Shakespeare's Othello, Iago deliberately implanted the idea of Desdemona's infidelity in Othello's mind. But that is an unlikely

scenario, to say the least.[26] But when a therapist honestly and in good faith believes that his or her patient has been subjected to an abominable crime by a family member, it is hardly outrageous for the therapist to encourage the patient to confront the fact of that crime.

### 2. *Litigation Is Not a Form of Therapy*

#### a. *Barratry? No*

In his complaint, Trear has alleged something in addition to the "implantation" in his daughter's mind of the false idea that he molested her, i.e., professional malpractice. He has also alleged that his daughter's therapist encouraged her to take legal action against him. Unfortunately, somewhere along the line some therapists have gotten the idea that a lawsuit is an appropriate means of treating disorders arising out of repressed memories of child sexual abuse. (See Wm. & Mary Note, *supra*, 37 Wm. & Mary L.Rev. at p. 352, fn. 113 ["Litigation is viewed as a source of empowerment"]; Kisch Article, *supra*, 5 Am. U. J. Gender & L. at p. 207 ["As part of her treatment, the patient decides to sue her father for the crime that is now twenty years old."].)

The stirring up of litigation generally goes under the legal heading of "barratry." (See *Rubin v. Green* (1993) 4 Cal.4th 1187, 1190 [17 Cal.Rptr.2d 828, 847 P.2d 1044].) Barratry is a *crime* (see Pen. Code, §§ 158, 159), now seldom prosecuted, and requires no less than three groundless lawsuits. (Pen. Code, § 159; *Rubin, supra*, 4 Cal.4th at p. 1190.)

It is hard to have any sympathy with the idea that a therapist may actually *prescribe* litigation as a form of "performance therapy." The judicial system most assuredly does not exist to provide a venue for cathartic confrontation. Instinctively then, the allegation that the therapist here encouraged Trear's daughter to sue her father as a form of therapy seems to cry out for some remedy along the lines of barratry. (Cf. *Bidna v. Rosen* (1993) 19 Cal.App.4th 27, 40-42 [23 Cal.Rptr.2d 251] (conc. & dis. opn. of Crosby, J.) [advocating cause of action for barratry against mother-in-law for stirring up frivolous family law OSC's (orders to show cases) against ex-son-in-law].)

Barratry, however, will not do as the remedy for this particular abuse of the legal system. As mentioned already, one of the elements of barratry is at

---

[26]Our research has not uncovered any case actually involving that set of facts but it is not impossible that it could come up. In footnote 16, *ante*, we discuss the idea that at least some therapists consider a confrontation with abuse to be therapeutic even if it is based on a *known* false assumption. The present case is difficult enough; we need not tackle that more difficult hypothetical.

least three groundless lawsuits; here, we have only one. And more importantly, our Supreme Court specifically rejected the idea of a private cause of action for barratry in *Rubin* v. *Green, supra,* 4 Cal.4th 1187, in the context of· attorney solicitations. If attorneys stirring up many cases were not subject to a barratry claim in *Rubin,* how much less appropriate to apply a barratry claim against a single therapist who in good faith and with no financial motive stirred up one.

### b. *Abuse of Process or Conspiracy to Commit Abuse of Process? No*

The use of the machinery of the legal system for an ulterior motive is a classic indicia of the tort of abuse of process. (E.g., *Coleman* v. *Gulf Ins. Group* (1986) 41 Cal.3d 782, 792 [226 Cal.Rptr. 90, 718 P.2d 77, 62 A.L.R.4th 1083] [entertainment of ulterior motive in using process is one of two elements of the tort].) However, the tort requires abuse of legal *process,* not just filing suit. Simply filing a lawsuit for an improper purpose is not abuse of process. (See *Oren Royal Oaks Venture* v. *Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 Cal.3d 1157, 1169 [232 Cal.Rptr. 567, 728 P.2d 1202] [and many authorities cited there].) Here, the complaint contains no facts which suggest that any process was used at all (like attachment or subpoena power) other than the mere filing of the suit in the first place.

### c. *Malicious Prosecution? No*

The remedy for filing a lawsuit for an improper purpose, of course, is malicious prosecution. (See *Oren Royal Oaks Venture* v. *Greenberg, Bernhard, Weiss & Karma, Inc., supra,* 42 Cal.3d at p. 1169 ["while a defendant's act of improperly instituting or maintaining an action may, in an appropriate case, give rise to a cause of action for malicious prosecution . . ."].) The question thus arises as to whether the therapist here might conceivably be liable for at least conspiring with her patient to maliciously prosecute Trear.

The lack of probable cause and malice elements in malicious prosecution (e.g., *Sheldon Appel Co.* v. *Albert & Oliker* (1989) 47 Cal.3d 863, 871 [254 Cal.Rptr. 336, 765 P.2d 498]) presents at least one very problematic question in the context of a parent suing an adult child's therapist for encouraging litigation as a form of therapy to deal with a false implantation of a memory of child abuse: If the therapist has a good faith belief that the child really was molested, would not that show there was no malice involved? Professional wrongheadedness, not to mention negligence, is not malice.

We need not go so far as to say even that, however, because of the readily dispositive absence of any favorable termination of the prior litigation. (See 47 Cal.3d at p. 871 [one element is that prior action was " 'pursued to a

legal termination in his, plaintiff's, favor' "].) Here, Trear jumped the gun and filed his suit before there was any termination of his daughter's suit against him.

### d. *Professional Malpractice by Way of Indemnity?*
### *Maybe, but Premature Here*

There is, however, an aspect of the fact that Trear has sued prematurely which bears observation. What if Trear had sued his daughter for malicious prosecution after a successful termination of *that* suit (in which a jury, presumably acting on its own subjective impression of the credibility of the parties, found Searles's newly uncovered memories of abuse to be figments of her imagination developed in therapy)? It is foreseeable that Searles would then turn around and sue her therapist for indemnity against any liability arising out of the malicious prosecution suit against her. The obvious theory of the patient's suit seeking indemnity in such an instance would be professional malpractice. To frame it in the colloquial: "Well, shrink, you got me into this mess by advising me to sue my father; you said it would be good for me to do so, and now that I have lost the case and he has sued me, you should cover it." Obviously, this is an issue not briefed in the present case, so we will do no more than indicate here that we are aware of it, and do not now address it. And, by the same token, nothing we say in this opinion is intended to comment, one way or the other, on *any* theory of malpractice which a *patient* might bring against a therapist based on false or implanted memories of child abuse. We simply hold that the therapist's duty does not extend beyond the patient to include someone who the therapist in good faith (even if negligently) concludes abused his or her patient.

### IV.  CONCLUSION

The law hardly asks lawyers to avoid negligently injuring the adversaries of their clients. The same dynamics apply to therapists in recovered memory cases, where there is an inherent choice to be made between believing the patient and the patient's possible abuser. The judgment is affirmed.

Wallin, J., and Crosby, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 12, 1999.