NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Hillsborough-northern judicial district
No. 2015-0457


THE STATE OF NEW HAMPSHIRE

v.

KYREE RICE

Argued: October 13, 2016
Opinion Issued: May 12, 2017


Joseph A. Foster, attorney general (Elizabeth A. Lahey, assistant attorney general, on the brief and orally), for the State.


Christopher M. Johnson, chief appellate defender, of Concord, on the brief and orally, for the defendant.


LYNN, J. The defendant, Kyree Rice, appeals his convictions for one count of attempted murder, see RSA 629:1, I (2016), and two counts of first degree assault, see RSA 631:1, I(b) (2016). He argues that the Superior Court (Abramson, J.) erred by not instructing the jury on the principle that the "act of producing or displaying a weapon shall constitute non-deadly force," RSA 627:9, IV (2016), and in prohibiting cross-examination of the victim about the victim's use of cocaine and marijuana on the night in question. Because we agree that the court erred in failing to give the requested jury instruction, we reverse and remand.

# I

The following facts were adduced at trial. At approximately 1:45 a.m. on May 24, 2015, the victim, Curtis Clay, and his girlfriend arrived at a restaurant in Manchester. Clay, a large and powerful man, had consumed approximately six alcoholic drinks prior to his arrival. The defendant, his brother Raheem Rice (Raheem), his cousin Beverly Pierson (Pierson), and his friend Rudy Vasquez (Vasquez), arrived at the restaurant around the same time.

The restaurant was very crowded. The defendant initially remained outside, while Raheem, Vasquez, and Pierson proceeded inside. Meanwhile, Clay stood inside, near the front of the restaurant. At some point, the defendant entered the restaurant and approached Raheem where he was waiting in line. The defendant overheard Raheem having a disagreement with another patron about a woman. In response, the defendant pulled his shirt up to reveal a gun, cocked it, and said, "you know what time it is." The defendant then exited the restaurant.

Subsequently, Pierson stumbled and collided into Raheem. Clay observed Raheem push Pierson away and Pierson fall to the floor. In response, Clay pushed Raheem's face with his hand and punched him. Raheem responded by punching Clay. Vasquez then pushed Clay from behind and a general melee ensued.

The defendant overheard the commotion and ran inside. Upon entering, the defendant observed Clay hit Vasquez, who was 6'4" tall and weighed 260 pounds, with such force as to knock Vasquez to the floor. Clay then turned back to Raheem. The defendant attempted to intervene by putting his arm between Clay and Raheem, but Clay grabbed the defendant's arm. The defendant responded by removing the gun from his waistband and, according to a State witness, sticking it into Clay's stomach. The defendant, however, testified that he "pulled out [his] firearm" at this point "[b]ecause Mr. Clay wasn't stopping and I just thought that if he seen [the gun] maybe he would stop." The defendant also disputed that he "jammed the gun into Clay's belly," as the State characterized his actions, testifying instead that it was Clay's action that caused the gun to "look[] like it did go into [Clay's] torso." According to the defendant, Clay then punched the defendant twice, knocking him off his feet and into a booth.

Clay again turned to Raheem and the two men continued to fight. Clay knocked Raheem to the ground, straddled him, and repeatedly punched him. After recovering from being knocked into the booth and observing Clay straddling and punching Raheem, the defendant fired two gunshots, both of which hit Clay. The defendant testified that the first shot was intended as a "warning shot," which he believed did not hit Clay; the defendant said that he fired the second shot because Clay was continuing to hit Raheem. According

2

to the defendant, he engaged in this course of conduct because he believed it necessary to prevent Clay from killing his brother.

After the shooting, the defendant left the restaurant. Clay's girlfriend drove Clay to Elliot Hospital where he received treatment for gunshot wounds. Clay underwent a battery of tests at the hospital, including a urine toxicology screening. He tested positive for alcohol, cocaine, and cannabis.

Approximately one week later, the defendant surrendered to the Manchester Police Department. As is relevant to this appeal, he was charged with one count of attempted murder and two counts of first degree assault. See RSA 629:1, I; RSA 631:1, I(b). The indictments alleged that the defendant committed attempted murder "when he shot [Clay]," and first degree assault "when he . . . shot . . . Clay in the left side" and "when he discharged a firearm into . . . Clay's right side."

At trial, the defendant pursued a justification defense. He admitted that he shot Clay, but argued that he was justified in using deadly force in defense of Raheem. See RSA 627:4, II(a) (2016). A person is justified in using deadly force against another person when he reasonably believes that the other person is about to use unlawful deadly force against himself or a third person and he reasonably believes that the amount of force he uses is necessary under the circumstances. See RSA 627:4, I-II(a); State v. Etienne, 163 N.H. 57, 77 (2011). Deadly force "means any assault or confinement which the actor commits with the purpose of causing or which he knows to create a substantial risk of causing death or serious bodily injury," RSA 627:9, II, (2016), whereas "'[n]on-deadly force' means any assault or confinement which does not constitute deadly force," RSA 627:9, IV. When, as in this case, evidence of self-defense or defense of another is admitted, "conduct negating the defense becomes an element of the charged offense . . . which the State must prove beyond a reasonable doubt." Etienne, 163 N.H. at 80-81 (quotation and citation omitted). The State's position was that the defendant was not justified in shooting Clay because he neither believed nor reasonably could have believed that Clay was about to use deadly force against Raheem, and because the amount of force he used was not reasonably necessary.

During trial, but prior to Clay's testimony, the trial court held a hearing outside the presence of the jury regarding the relevance of evidence that Clay had ingested cocaine and marijuana on the night of the fight. Defense counsel argued:

> I think it's a fair question to ask [Clay] if he did cocaine that day. If he says 'no,' I'm stuck with the answer but — and I think that a reasonable juror can assume that combining cocaine and alcohol is going to affect somebody's ability to perceive. . . . [A]nd also, the

3

doctor testifie[d] [in his deposition] that it affects his level of aggression, which is also an issue in this case.

Defense counsel also proffered the deposition testimony of Dr. Miguel Gaeta to demonstrate the evidence's relevance. The trial court ruled that the drug use evidence was irrelevant and, therefore, inadmissible for impeachment and substantive purposes because the defendant failed to link the drug use — through expert testimony or other evidence — to impairment of the victim's perceptions and memory, or increased aggressiveness.

In closing argument, the defendant's counsel asserted that the defendant used a variety of methods to halt the victim's aggression towards Raheem. He characterized these efforts as incrementally more forceful:

[Defense counsel]: He tried to use non-deadly force; put his arms up; tried to hold Mr. Clay back. What happened when he did that? He was — his arm was swung and he got punched twice. During the course of that he tried to show Mr. Clay the weapon in the hopes that he would stop. Either Mr. Clay didn't see it or didn't care, but he tried to use it in a non-deadly manner to get Mr. Clay to stop. Mr. Clay didn't stop. He was engaged in combat. He was enraged and he was relentless.

When my client was able to get up out of the booth — (Pause) — what he saw was that. Mr. Clay, a wild man, just as Ashley Francis described him. (Pause) And then he saw his brother go down and Mr. Clay get on top of his brother. And what did Mr. Clay doing [sic] in this video? Just as I've demonstrated to you at least twice now, got down and he was like this, whaling on Raheem Rice. (Pause)

That's the situation that presented itself to Kyree Rice on May 24. Did he unload that weapon into Mr. Clay? No. He did not.

He used a range of efforts to try to stop Mr. Clay and those efforts didn't work. Using his hands, it didn't work. Show him the gun, didn't work. For those efforts he got nailed, flew into the booth. Firing a warning shot didn't work.

Now as it turns out that warning shot did hit Mr. Clay; wasn't intended to. It was intended to be a warning shot and as you learned during the cross-examination of Kyree Rice, the warning actually probably put his brother in greater danger, probably better than — probably more danger than Mr. Clay.

4

Wasn't intended to hit Mr. Clay. Why would he put his brother in danger? He was trying to stop him.

And then finally, he felt that he had to use under the circumstances as he saw them that evening, which is the circumstances that you must put yourself in his shoes, felt that he needed to use that deadly force. And based upon what he saw, that use of deadly force was reasonable and necessary. It was reasonable and necessary to stop Mr. Clay from using deadly force against Raheem Rice.

In its closing, the State was dismissive of the defense-of-another defense. Its theory was that the defendant was "looking for a fight" and that his use of deadly force was "unreasonable and unnecessary." Utilizing the videotape of the incident that had been received in evidence, the prosecutor first focused upon the defendant's actions the first time he entered the restaurant, arguing that he intervened in a dispute between Raheem and another man, who were arguing over a woman, by lifting up his shirt to "flash" his gun.[1] The prosecutor next turned to the defendant's actions when Clay knocked Vasquez to the floor and turned back to confront Raheem:

[Prosecutor]: Now at this point that's when the defendant comes back into the restaurant. And when the defendant comes back into the restaurant, here's the gun, right there. There's the gun in his hand. Gun clearly pointed at Curtis's belly. (Pause) He's jamming that belly [sic] into Curtis's stomach.

So now at this point, this is where the defendant, Kyree Rice introduces deadly force into this event. So let's review what's occurred up to this point. When the defendant enters with deadly force, Curtis pushed Raheem; pushed him in the face. Curtis tried to punch Raheem, but was unsuccessful.

Rudy Vasquez voluntarily decided to fight with Curtis by running across the restaurant. Curtis landed a punch squarely on Rudy Vasquez. And Raheem reached out to make contact with Curtis. That's what happened up to the point where the defendant introduces deadly force, when he put the gun to Curtis's belly.

Was deadly force needed at that point? It was unreasonable and unnecessary at that time.

---

[1] The State also claimed that the defendant challenged the man to come outside. However, this argument appears to be somewhat of a mischaracterization of the evidence. As discussed previously, the evidence was that, after displaying and cocking the gun, the defendant did not challenge the other person to step outside, but instead said: "you know what time it is."

(Emphasis added.)  The prosecutor then reviewed what happened next: Clay grabbed the defendant's hand, pushed him away and landed "one good left punch on the defendant and the defendant falls backwards . . . into the booth"; Clay and Raheem "squared off," demonstrating a willingness to engage in mutual combat, with Raheem showing no signs that he was afraid of Clay; and the defendant got up from the booth, moved toward Clay, and fired at least two shots while aiming directly at Clay (both of which hit Clay).  She argued that the defendant "had no reason to bring deadly force, or self-defense to a mutual fight," and asserted that the defendant's real motive for shooting Clay was that he was angry that Clay had "sucker punched" him in front of his friends.  ("He has been disrespected in the ultimate epic way possible in a tiny, crowded restaurant. . . .  And he knows who just sucker punched him.  And he is looking for revenge.")

After the arguments were concluded, the defendant pointed out that, in her closing, the prosecutor "told the jury that [the defendant] injected deadly force . . . when he pulled the weapon out," and asked the court to include in its instructions the second sentence of RSA 627:9, IV, which states that "producing or displaying a weapon shall constitute non-deadly force."  The court responded that it viewed the prosecutor's reference to the point at which the defendant pulled his gun as an argument regarding when the defendant formed his intent to use deadly force.  When the defendant argued that the jury might not have understood the prosecutor's reference that way, the court stated that it would review the matter further and decide if such an instruction was required.  Following a recess, the court declined to give the instruction, concluding that the second sentence of RSA 627:9, IV "applies to a situation where it's merely brandishing a weapon and not an integral part of the crime that the State has argued here."

The jury found the defendant guilty of all three charges, but because the parties agreed that the first degree assault charges were alternatives to the attempted murder charge, the court sentenced the defendant on the attempted murder conviction only, and held in abeyance sentencing on the first degree assault charges pending any appeal.

II

The defendant raises three issues on appeal.  He argues that the trial court erred by: (1) prohibiting cross-examination of the victim about the victim's cocaine use for the substantive purpose of demonstrating the extent of the victim's aggression; (2) prohibiting cross-examination of the victim about the victim's use of cocaine and marijuana to impeach the victim's credibility, specifically his perception and memory of the fight; and (3) declining to instruct the jury that "[t]he act of producing or displaying a weapon shall constitute non-deadly force."  Because we find the last issue dispositive, we address it first.

6

A

The defendant asserts that the trial court erred by not instructing the jury that "[t]he act of producing or displaying a weapon shall constitute non-deadly force." RSA 627:9, IV. "Whether a particular jury instruction is necessary, and the scope and wording of jury instructions, are within the sound discretion of the trial court, and we review the trial court's decisions on these matters for an unsustainable exercise of discretion." Etienne, 163 N.H. at 70 (quotation omitted). "To show that the trial court's decision is not sustainable, the defendant must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of his case." Id. (quotation omitted).

The defendant argues that "whether the [trial] court should have given the instruction . . . depends on whether the principle became relevant to any issue the jury had to decide." He contends that the State's closing had the effect of shifting "the crucial moment for assessing the reasonableness of [the defendant's] belief in the necessity of his use of deadly force" from the moment he fired his gun to the moment he drew the gun, pointed it at Clay, and/or "jammed that [gun] into Clay's stomach." (Quotation and brackets omitted.) Because the State's closing focused on that earlier point in time, the defendant contends, the legal principle embodied in this statute, i.e., that "[t]he act of producing or displaying a weapon shall constitute non-deadly force," became relevant to the issues before the jury.

In response, the State first argues that the defendant waived this jury instruction claim by not properly briefing it. Specifically, the State asserts that the trial court's ruling was based upon its interpretation that RSA 627:9, IV did not apply to the facts of this case, and it suggests that the defendant's brief does not challenge the court's interpretation. We find this argument unpersuasive. The premise upon which the appeal is based is the claim that the principle embodied in the second sentence of RSA 627:9, IV is applicable to this case. Furthermore, the defendant has adequately set forth in his brief the basis upon which he claims the trial court erred. We thus conclude that the jury instruction issue is properly before us for review.

With respect to the merits, the State argues that the trial court did not unsustainably exercise its discretion in refusing to give the requested instruction.[2] We disagree. We conclude that the outcome here is largely governed by our decision in State v. Gingras, 162 N.H. 633 (2011). In Gingras, the defendant was charged with, among other offenses, criminal threatening and reckless conduct arising out of a road-rage incident during which he

---

[2] The State does not dispute that there was "some evidence" to support a defense-of-others defense, and that the defendant therefore was entitled to have the jury instructed about the matter. State v. Ayer, 154 N.H. 500, 514 (2006).

pointed a gun at the other motorist and threatened to shoot him if he did not back away. <u>Gingras</u>, 162 N.H. at 635-36. The defendant claimed he acted in self-defense, and the State conceded that the evidence produced at trial was sufficient to require a jury instruction on the issue. <u>Id</u>. at 637. The defendant asked the court to instruct the jury on the definitions of deadly force and non-deadly force, which, at the time of the events at issue, were as follows:

> "Deadly force" means any assault or confinement which the actor commits with the purpose of causing or which he knows to create a substantial risk of causing death or serious bodily injury. <u>Purposely firing a firearm capable of causing serious bodily injury or death in the direction of another person or at a vehicle in which another is believed to be constitutes deadly force.</u>

RSA 627:9, II (2016) (emphasis added).

> "Non-deadly force" means any assault or confinement which does not constitute deadly force.

RSA 627:9, IV (2007) (amended 2011).

The court instructed the jury in accordance with the above definitions, except that, in instructing on the definition of deadly force, the court declined to read the emphasized second sentence of RSA 627:9, II. <u>Gingras</u>, 162 N.H. at 638. The court reasoned that doing so was unnecessary because there was no evidence that the defendant had actually fired his gun. <u>Id</u>. On appeal, we reversed on the grounds that failure to give the full definition of deadly force constituted prejudicial error. <u>Id</u>. at 639-40.

In so ruling, we noted that the definitions of both "deadly force" and "non-deadly force" require that there be either an "assault" or a "confinement." <u>Id</u>. at 639. Because there was no evidence that the defendant confined the victim, we focused on the term "assault." We observed that, although RSA 627:9 does not define "assault," the statute "make[s] clear that the difference between an assault that involves the use of deadly force and one that does not is that the former must involve conduct that 'creates a substantial risk of causing death or serious bodily injury,' whereas the latter does not." <u>Id</u>. (brackets omitted). We reasoned that the legislature's inclusion of the second sentence in RSA 627:9, II's definition of "deadly force" was "a strong indication that, in the absence of this provision, such discharge of a firearm would not, without more, constitute the use of deadly force – otherwise there would have been no need for the legislature to include it." <u>Id</u>. We then explained how the omission of the second sentence of RSA 627:9, II from the instructions was prejudicial to the defendant:

If the jury had been given the full definition of deadly force, including the second sentence of RSA 627:9, II, it could well have found that, if the legislature deemed it necessary to include a specific provision dealing with the firing of a gun at another person or a vehicle in order to capture such conduct within the ambit of deadly force, then the defendant's conduct of merely pointing his gun at [the victim] without discharging it constituted the use of non-deadly force. However, without knowing about the second sentence of RSA 627:9, II, there is a significantly greater likelihood that the jury may have determined that the defendant's act of pointing his gun at [the victim] did constitute the use of deadly force. And if the jury made this finding, it may then have determined, in accordance with the court's instructions, that the defendant's use of deadly force in self-defense was not justified inasmuch as [the victim] was not armed with a weapon and had not threatened the defendant with the imminent use of deadly force. On this basis, the jury could have rejected the defendant's claim of self-defense and found him guilty of the criminal threatening and reckless conduct offenses.

Id. at 639-40.[3]

The events in Gingras occurred prior to the 2011 amendment to RSA 627:9, IV (2016) that added the second sentence to paragraph IV and, accordingly, we had no occasion to consider that amendment in our decision in that case. The amendment provides: "The act of producing or displaying a weapon shall constitute non-deadly force." Laws 2011, 268:4. The 2011 amendment demonstrates that our rationale in Gingras accorded with legislative intent regarding the use of a weapon in self-defense or defense of others. Reading RSA 627:9, II and IV together, we conclude that, at least with respect to the defensive use of a firearm that does not involve the shooting of another person, the legislature has established three categories of such use: (1) if the actor purposely discharges a firearm in the direction of another person or of a vehicle in which another person is believed to be located, the actor has used deadly force as a matter of law; (2) if the actor merely produces or displays a weapon, the actor has used non-deadly force as a matter of law; and

---

[3] In Gingras, we also found that the likelihood of jury confusion in the absence of a full instruction on the definition of deadly force was enhanced by the fact that the criminal threatening and reckless conduct charges both included use of a deadly weapon as elements of the offenses, and both indictments alleged that the defendant's firearm constituted a deadly weapon. Gingras, 162 N.H. at 640. We observed that the definitions of "deadly weapon" and "deadly force" are not the same. Id. Yet because, as used by the defendant, his firearm clearly constituted a deadly weapon, there was a danger that, without proper instructions, "the jury could easily have assumed that if the defendant had used a deadly weapon it automatically followed that he had used deadly force." Id. The same potential for confusion exists in this case, inasmuch as the first degree assault indictments alleged use of a deadly weapon. See RSA 631:1, I(b).

9

(3) if the actor's use of a firearm falls somewhere between (1) and (2) or is otherwise not covered by (1) or (2), the determination of whether the use constitutes deadly force or non-deadly force is a factual matter for the jury to decide. Accord Stewart v. State, 672 So. 2d 865, 868 (Fla. Dist. Ct. App. 1996) ("When the evidence does not establish that the force used by a defendant claiming the right to use force [in self-defense or defense of another] is deadly or nondeadly as a matter of law, the jury should be allowed to decide the question."); Com. v. Allen, 918 N.E.2d 92, 94 (Mass. App. Ct. 2009) ("Where the level of force cannot be determined as a matter of law, instructions on both the use of deadly force and nondeadly force must be given." (quotation and ellipsis omitted)), abrogated in part on other grounds by Com. v. Wynton W., 947 N.E.2d 561 (Mass. 2011); see also Marty v. State, 2016 WL 4944100, *4 (Fla. Dist. Ct. App. 2016) ("Marty pointing a gun at [the victim] without firing at her did not, as a matter of established law, constitute deadly force."); State v. Cannell, 916 A.2d 231, 234 (Me. 2007) ("[W]e have unequivocally held that using a gun in a threatening manner without discharging the weapon constitutes nondeadly force only, and does not amount to the use of deadly force."); cf. Com. v. Cataldo, 668 N.E.2d 762, 764-68 (Mass. 1996) (holding, consistent with Model Penal Code § 3.11 and accompanying comments, that brandishing or pointing a gun at another in self-defense or defense of a third person does not constitute deadly force if purpose is merely to threaten that the actor will use deadly force if necessary, rather than to cause death or great bodily injury, and that question of actor's intent must be decided by jury).[4]

The State asserts that the defendant does not claim that its closing argument constituted a misstatement of the law. Although the defendant's brief does not use those words, the upshot of his argument is plainly to this effect. The entire point of the defendant's argument is that the instruction about RSA 627:9, IV that he requested was necessary because, had it been

---

[4] Section 3.11(2) of the Model Penal Code states, in relevant part:

> A threat to cause death or serious bodily injury, by the production of a weapon or otherwise so long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute deadly force.

American Law Institute Model Penal Code and Commentaries § 3.11(2), at 157 (1985). The commentary to this section explains its rationale:

> There is some authority at common law for saying that where there is no justification for using extreme force in self-defense, threatening to use it may be considered an assault. This is an unduly severe rule, however, and it would be altered by Subsection (2). The object is to provide that even though the defendant fears only slight injury, he may lawfully threaten his adversary with a knife or gun by way of defense, provided that he does not intend to carry out the threat. The formulation in these terms seems to reach the same result as does the Restatement of Torts.

Id., cmt. 2, at 160.

10

given, the jury could have determined that the prosecutor's argument was at odds with the applicable law. Even if one assumes that the defendant's conduct of pointing the gun at Clay (or "jamming [it] in Curtis's stomach," to use the State's characterization) goes beyond the statutory language of "producing or displaying" a weapon — a dubious proposition in light of the authorities cited above — so as to make the question of whether it amounted to deadly force an issue for the jury, the defendant's point is that in order to properly make that determination the jury needed a full understanding of the law regarding what conduct does, and what conduct does not, constitute deadly force, and that the omission of the second sentence of RSA 627:9, IV from the instructions deprived the jury of an essential part of that governing law.

We acknowledge that this case is distinguishable from <u>Gingras</u>, in that in <u>Gingras</u>, the defendant's act of pointing his gun at the victim was the very conduct that constituted the crimes with which he was charged, while here the specific act that formed the basis for the charges against the defendant was his shooting of the victim. We are not persuaded, however, that this factual distinction justifies a difference in outcome. We agree that the ultimate issue to be decided by the jury was whether, at the time he shot Clay, the defendant was justified in using deadly force. Yet in deciding on the ultimate issue a jury invariably must resolve a host of subsidiary issues, such as witness credibility, conflicts in testimony, the reliability of certain evidence, whether it has sufficient confidence that the facts satisfy the burden of proof, etc. The trial judge's responsibility to instruct the jury in a criminal case is not limited to simply enumerating the elements of the charged offense(s). Instead, "[t]he purpose of the trial court's charge is to state and explain to the jury, in clear and intelligible language, the rules of law applicable to the case"; and we have not hesitated to reverse when "the instructions did not fairly cover the issues of law in the case." <u>Gingras</u>, 162 N.H. at 638 (quotations omitted). As explained below, in arriving at its ultimate decision on the issue of guilt or innocence, the jury undoubtedly focused on the reasonableness of the defendant's (and Clay's) course of conduct throughout their encounter, and without an instruction on the use of non-deadly force, the prosecutor's argument created a significant risk that the jury would misunderstand the legal implications of the defendant's conduct in the moments before he used deadly force.[5]

---

[5] We reject the suggestion that the trial court's boiler plate instruction, to the effect that the jury was to disregard anything the lawyers said about the law if it differed from the court's instructions, was sufficient to cure any possible prejudice resulting from the prosecutor's argument. The problem with this suggestion is that the court gave no instructions at all regarding the use of non-deadly force, and without such instructions as a benchmark for measuring the difference between deadly and non-deadly force, the jury may not have perceived that there was a difference between what the prosecutor argued constituted deadly force and what the court said constituted the use of deadly force.

11

We note that the State does not contend that the trial court correctly construed the second sentence of RSA 627:9, IV as being inapplicable when the display or brandishment of a weapon is "an integral part" of the crime charged. As the defendant correctly observes, the definitions found in RSA 627:9 apply "as used in this chapter," and RSA 627:4, which describes the circumstances when deadly and non-deadly force may be used in self-defense or defense of another, is obviously part of chapter 627. And, of course, the very purpose of RSA chapter 627 is to describe justifiable conduct that constitutes a "defense" to the offenses with which a person may be charged under the Criminal Code. See RSA 627:1 (2016); cf. State v. Noucas, 165 N.H. 146, 155 (2013) (holding that to be entitled to jury instruction a defense must be "legally available in light of the charged offense and the evidence adduced at trial"). In short, the second sentence of RSA 627:9, IV would be effectively eviscerated were it unavailable when the conduct it describes is "an integral part" of what the State alleges constitutes a criminal offense.

Our decision in State v. Noucas also supports our decision here. In Noucas, the defendant was charged with the crime of armed robbery under an accomplice liability theory. Noucas, 165 N.H. at 149. He denied participation in the robbery and testified that he entered the house where the alleged robbery occurred in order to find his companion, and that while inside he used force against the alleged victim of the robbery in order to defend his companion from an attack by the victim. Id. at 153. Because he acknowledged using physical force, the defendant argued that he was entitled to a defense-of-others jury instruction. Id. at 153-54. We rejected this argument because the standard defense-of-others instruction the defendant sought would have had the effect of telling the jury that it must find the defendant not guilty of armed robbery if it found that he acted in defense of his companion. Id. at 154-56. As we pointed out, the flaw in the defendant's position was that even if the jury found that he did use force to defend his companion, it could also have found that he was guilty of the armed robbery. Id. at 156-57. We specifically noted, however, that, had the defendant so requested, he might have been entitled to a "narrowly crafted" instruction designed to inform the jury of the need to distinguish between force used to defend his companion and the force required as an element of armed robbery. Id. at 156.

Here, the defendant's requested instruction was the kind of "narrowly crafted" instruction we contemplated in Noucas. Unlike the defendant in Noucas, who did not admit to any of the facts constituting the charged armed robbery, id. at 156, the defendant here admitted that he eventually did use deadly force against Clay. His defense was that, at the point when he did so, his actions were justified. More importantly, the requested instruction would not have had the effect of telling the jury that, if it found he used non-deadly force when he drew/pointed his gun, he must be found not guilty because the State had therefore failed to prove one of the elements of the charged offenses.

12

<u>Cf</u>. <u>Noucas</u>, 165 N.H. at 156-57.[6]  Instead, the instruction would simply have provided the jury with necessary guidance "about the legal significance of claimed facts."  <u>State v. Bruneau</u>, 131 N.H. 104, 117-18 (1988).  As such, the instruction fell "within the scope of [the] judge's responsibility to instruct the jury on the law."  <u>Id</u>.

Although the trial court's construction of RSA 627:9, IV was incorrect, its description of the defendant's conduct in drawing his gun/pointing it at Clay as being "an integral part of the crime" highlights the potential for jury confusion resulting from the court's failure to give the requested instruction. The record makes it clear that the critical events occurred over a very brief span of time — a matter of minutes or perhaps even seconds.  Thus, in assessing the defendant's defense it would have been necessary for the jury to determine, among other things, what conduct was or was not reasonable at various points in an ongoing, stressful, and rapidly changing situation.  The defendant contended that he used reasonable, incremental force in an effort to stop Clay's attack on Raheem — first using his hands, then drawing/pointing the gun, and only after those measures failed, firing the gun.  But the prosecutor's argument could readily have been understood by the jury as asserting that the defendant's act of pulling out his gun itself constituted the use of deadly force, and the court instructed the jury that the defendant was justified in using deadly force only if he reasonably believed that Clay was about to use unlawful deadly force against himself or Raheem.  Because the evidence showed that, at the point the defendant pulled out the gun, Clay had not yet brought Raheem down and begun punching him while straddling him on the floor, the jury could well have found that the defendant could not then have reasonably believed that Clay posed an imminent threat of using deadly force against Raheem.  And if the jury concluded that the defendant had acted illegally by resorting to deadly force when it was unreasonable to do so, that could easily have influenced its assessment of the reasonableness of his conduct a few moments later when he fired the gun.  Simply put, a conclusion by the jury that the defendant resorted to the use of unlawful deadly force merely by drawing his gun or pointing it at Clay makes it much more likely that the jury would have concluded that the defendant was "trigger happy," intended to shoot Clay all along, and did not reasonably believe that Raheem was in mortal danger a short time later when the defendant fired the gun.

On the other hand, if the jury had been instructed that producing or displaying a weapon constitutes the use of non-deadly force, then it may well

---

[6] We acknowledge that in this case, as in <u>Noucas</u>, even if a properly instructed jury had found that the defendant's conduct in drawing his gun and/or pointing it at Clay did not constitute the use of deadly force, it could <u>also</u> have found that his subsequent conduct of using deadly force (<u>e.g.</u>, by shooting Clay) was not justifiable.  As explained in the text, however, the prejudice resulting from failure to give the instruction on the legal implications of the earlier conduct is that it created a significantly greater risk that the jury would make such a finding about the later conduct than would have been the case had the jury been properly instructed as to the terms of RSA 627:9, IV.

have concluded that the defendant's action in pulling his gun or pointing it at Clay (or "jamming [the gun] in Curtis's stomach") at the time he did so was not unlawful, but instead was a reasonable response to a non-deadly attack upon Raheem by Clay. And if the jury determined that the defendant acted reasonably and lawfully in making non-deadly use of the gun at that time as a threat intended to cause Clay to cease his non-deadly attack on Raheem, that would have supported the defense's contention that he used only such incremental force against Clay as he thought was necessary, and could have impacted the jury's assessment of whether he reasonably believed it was necessary to use deadly force when he did so.

Finally, we address what may be termed the State's "good enough" argument. In Gingras we held that if the jury had been instructed, in accordance with RSA 627:9, II, that the act of firing a firearm at another or at a vehicle in which another is believed to be constitutes the use of deadly force, it may have found that the defendant's act of pointing a gun at another without firing did not constitute the use of deadly force. Gingras, 162 N.H. at 639. Because the trial court gave that instruction in the present case, the effect of so doing, the State contends, provided the jury with a sufficient basis for understanding that the defendant's act of drawing/pointing the gun at Clay did not constitute deadly force. This argument fails for three reasons.

First, unlike in Gingras, where there was no specific indication of how the prosecutor characterized the defendant's conduct, see Gingras, 162 N.H. at 633, here the prosecutor's argument could have been understood as asserting that producing the gun constituted deadly force as a matter of law. In light of this argument, there was an even greater need than existed in Gingras for the court to fully instruct the jury as to the governing legal principles regarding the defendant's use of the gun for defensive purposes short of firing it. Second, in Gingras, the trial court gave at least some instruction on the matter of non-deadly force by reading the first sentence of RSA 627:9, IV, see Gingras, 162 N.H. at 638, whereas in this case the court gave no instruction at all about non-deadly force. Thus, the jury was given no guidance in determining whether the defendant's act of pulling and/or pointing the gun could be found to be non-deadly force. Third, although it is true, as we held in Gingras, that the court's reading of the second sentence of RSA 627:9, II could have led the jury to find that the defendant's acts of drawing and/or pointing his gun without firing it did not constitute the use of deadly force, Gingras, 162 N.H. at 639, in order to make such finding the jury would have had to engage in the comparatively sophisticated deductive process of drawing inferences as to legal principles from what the legislature did not capture within the terms of RSA 627:9, II. With the enactment of the second sentence of RSA 627:9, IV, however, the legislature made an affirmative pronouncement that the act of producing or displaying a weapon constitutes the use of non-deadly force. Awareness of the provisions of this statute would have significantly enhanced the prospect that the jury would find that the defendant's actions with the gun

prior to firing it did not constitute the use of deadly force, which, as explained above, could have resulted in a different verdict. For these reasons, we reject the State's argument that the trial court's instruction on the second sentence of RSA 627:9, II was "good enough" to alleviate the prejudice resulting from its failure to instruct as to the second sentence of RSA 627:9, IV.

Properly understood, Gingras stands for the proposition that when a provision of law is necessary for the jury to fully understand the legal implications of a view of the facts for which there is support in the evidence and which may have a critical bearing on the jury's decision-making, the trial court, upon request, must include an instruction regarding such law in its charge to the jury. Because the trial court failed to instruct the jury regarding the use of non-deadly force in accordance with the second sentence of RSA 627:9, IV, we reverse the defendant's convictions and remand for a new trial.

B

Notwithstanding our remand, we next consider the defendant's argument that the trial court erred by prohibiting the defendant from cross-examining Clay about his cocaine use for the substantive purpose of demonstrating the victim's aggressiveness during the fight. We address this issue in the interest of judicial economy because it may arise upon retrial. See State v. Sweeney, 151 N.H. 666, 674 (2005).

The defendant asserts that the court's ruling violated his constitutional rights under Part I, Article 15 of the New Hampshire Constitution and the Sixth and Fourteenth Amendments to the United States Constitution. He argues that the evidence was relevant to demonstrate the reasonableness of his belief that Clay was about to use unlawful deadly force against Raheem.

The defendant proffers a chain of inferences to establish the relevance of Clay's cocaine use: cocaine intoxication is associated with increased aggression; Clay's use of cocaine, therefore, supports an inference that he used a great degree of force during the fight; and the actual degree of force Clay used in the fight would have provided circumstantial evidence of the reasonableness of the defendant's belief that Clay was about to use deadly force against Raheem. In contrast, the State argues that the cocaine evidence was not relevant for this purpose because the defendant did not establish whether the amount of cocaine in Clay's system could cause increased aggressiveness. We agree with the State that the trial court properly excluded this evidence as irrelevant. We address this issue first under the State Constitution and rely upon federal law only to aid our analysis. State v. Ball, 124 N.H. 226, 231-33 (1983).

"The right to cross-examine adverse witnesses in criminal cases is fundamental," State v. Fichera, 153 N.H. 588, 598 (2006), and "an incident of

15

rights guaranteed by [P]art I, [A]rticle 15 of the State Constitution," State v. Stowe, 162 N.H. 464, 467 (2011) (quotation omitted). Although fundamental, this "right is not unfettered." State v. McGill, 153 N.H. 813, 817 (2006). "Trial courts have broad discretion to fix the limits of proper areas of cross-examination . . . ." Id. Cross-examination eliciting irrelevant evidence is not a proper matter of inquiry, as the defendant "has no constitutional right to present irrelevant evidence." State v. Mitchell, 148 N.H. 293, 294 (2002). Indeed, irrelevant evidence is inadmissible. N.H. R. Ev. 402.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.H. R. Ev. 401; see also Mitchell, 148 N.H. at 294-95. "Whether evidence is relevant is a question for the trial court's sound discretion, and we will not overturn its determination absent an unsustainable exercise of discretion." Mitchell, 148 N.H. at 294. "To show an unsustainable exercise of discretion, the defendant must demonstrate that the court's ruling was clearly untenable or unreasonable to the prejudice of his case." Id. "The party offering evidence generally bears the burden of demonstrating its admissibility." State v. Walters, 142 N.H. 239, 242 (1997).

We agree with the trial court that the defendant failed to carry this burden. The defendant sought to question Clay about his use of cocaine on the night of the fight. The relevance of this evidence depended upon the premise that cocaine use causes aggressive behavior. To establish this link between cocaine use and aggression, the defendant made a proffer based exclusively upon Dr. Gaeta's expert deposition testimony. The defendant argued that, assuming Clay admitted to using cocaine on the night in question, that evidence would be relevant because the jury could reasonably infer, based upon Gaeta's proposed trial testimony, that Clay's cocaine use caused him to act aggressively during the fight.

However, Gaeta's deposition testimony did not establish that cocaine use causes aggression; it established only that "impairment from the abuse of cocaine" is "associated with aggression, pain control or alleviation of pain, wakefulness, [and] alertness." (Emphases added.) The defendant did not seek to inquire whether Clay was impaired from the abuse of cocaine, nor did Gaeta opine that the amount of cocaine found in Clay's urine at the time he was hospitalized evidenced "impairment from the abuse of cocaine." Thus, even assuming that Clay testified that he used cocaine that night and Gaeta testified consistent with his deposition testimony, a link between cocaine use —as opposed to impairment from its abuse — and aggression would still be absent, and the jury could not reasonably draw a connection between Clay's cocaine use and his behavior on the night in question. Because the defendant did not demonstrate the relevance of Clay's cocaine use, we conclude that the trial court sustainably exercised its discretion in excluding that evidence. Compare Robinson v. State, 527 S.E.2d 845, 846 (Ga. 2000) (trial court properly

excluded cross-examination regarding victim's drug use and possession where proffered expert "could not say what, if any, effect cocaine had" on the victim at the relevant time), with McWilliams v. State, 632 S.E.2d 127, 130 (Ga. 2006) (trial court erred in excluding evidence of victim's drug use where defense expert testimony provided outside the presence of the jury supported causal connection between the presence of cocaine and alcohol in the victim's body and her potential behavior at the operative time).

The Federal Constitution offers the defendant no greater protection than does the State Constitution under these circumstances. See Mitchell, 148 N.H. at 294; Jones v. Goodwin, 982 F.2d 464, 469 (11th Cir. 1993) ("[T]he Sixth Amendment only protects cross-examination that is relevant." (quotation omitted)). Accordingly, we reach the same result under the Federal Constitution as we do under the State Constitution.

C

Finally, we turn to the defendant's argument that the trial court erred by prohibiting him from cross-examining Clay about his use of cocaine and marijuana in order to impeach his credibility. In response to the State's objection at trial on relevance grounds, the defendant argued that Clay's drug use was relevant to impeach his credibility because it would bear on the jury's assessment of his perceptions or memory of the fight. He asserted that he had a "good faith basis" to inquire about Clay's drug use and that he need not proffer an evidentiary connection between Clay's drug use and impairment of his memory and/or perception because "a reasonable juror can assume that combining cocaine and alcohol is going to affect somebody's ability to perceive." The defendant made no proffer as to Clay's expected testimony.

However, on appeal, the defendant has not developed his trial argument that the effect of cocaine, alcohol, and marijuana on perception and memory is within the common knowledge and understanding of an average juror. See Silva v. Warden, N.H. State Prison, 150 N.H. 372, 374 (2003) (stating that expert testimony is not necessary where matter to be determined "is within the realm of common knowledge and everyday experience"). To the extent he has briefed this argument on appeal, he argues only that "[n]obody disputed that intoxication by [cocaine and marijuana] could impair perception and memory." (Emphasis added.)

We have never addressed whether the combined effects of cocaine, marijuana, and alcohol upon perception and memory are within the common knowledge and understanding of an average juror. Other jurisdictions are split on this question. Compare Lyba v. State, 583 A.2d 1033, 1036 (Md. 1991) ("It is common knowledge that the quantity of alcohol and/or drugs consumed will affect one's ability to see, to hear, and, generally, to perceive what is occurring." (quotation omitted)), with Hernandez v. Cnty. of Los Angeles, 173 Cal. Rptr. 3d

226, 238 (Ct. App. 2014) ("The probable effect of intoxicants other than alcohol is a topic sufficiently beyond the common experience of most jurors that expert testimony is required." (quotations and brackets omitted)).  Because the parties have not fully briefed the issue, we decline to address it now.  See State v. Blackmer, 149 N.H. 47, 49 (2003) ("[W]e confine our review to only those issues that the defendant has fully briefed.").  Because there must be a new trial, the parties may address this issue further before the trial court.

Reversed and remanded.

DALIANIS, C.J., and HICKS, CONBOY, and BASSETT, JJ., concurred.